## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No: 21-52150 |
| 5AAB Transport, LLC, *et al.* | : | Chapter 11 |
| | : | Judge John E. Hoffman, Jr. |
| Debtors. | : | |
| | : | Joint Administration Requested |

## <u>DECLARATION OF HARDEEP SINGH</u>

Hardeep Singh declares in accordance with 28 U.S.C. § 1746 (the "Declaration"):

1.      I am a fifty-percent member of the following companies (together, the "Companies"):

      a.      5AAB Transport, LLC, an Ohio limited liability company formed on June 23, 2011("Transport");

      b.      5AAB Holding, LLC, an Ohio limited liability company formed on July 8, 2016 ("Holding");

      c.      SJS Transport, LLC, an Ohio limited liability company formed on September 18, 2013 ("SJS"); and

      d.      Heavy Diesel Service, LLC, an Ohio limited liability company formed on March 1, 2017 ("Diesel").

2.      The other fifty-percent member of each of the Companies is Navdeep Sidhu. Together, Mr. Sidhu and I manage all operations of the Companies and have done so since we formed each of the Companies. I am personally familiar with all aspects of the Companies' history, financials, and operations.

3.      The Companies are the debtors in these chapter 11 cases, for which there is a pending request for joint administration.

4.     I am authorized to submit this declaration on behalf of each of the Companies.

5.     Unless otherwise stated, all facts set forth in this declaration are based on my personal knowledge, review of relevant documents, discussions with the Companies' advisors and professionals, or are my opinion, which is based on my personal experience and knowledge of the Companies' operations and financial affairs. If I am called as a witness in this case, I would testify competently to the facts set forth in this declaration.

6.     I submit this declaration to assist the Court and parties in interest with understanding the background of the Companies and the circumstances that resulted in the commencement of this case. Further, I submit this declaration to support the Companies' requests for relief with respect to their (a) voluntary petitions for relief under title 11 of the United Stated Code; and (b) initial motions and applications that are being filed contemporaneously with this declaration (the "Motions"). This declaration is referred to as the "Singh Declaration" and is incorporated into each of the Motions.

7.     To familiarize the Court with the Companies and the various types of relief they seek at the outset of this case, this declaration is organized into four parts. First, I provide general information regarding the Companies and their current business operations. Second, I provide an overview of Companies' organizational, capital, and debt structures. Third, I describe the circumstances that led to the commencement of the cases. Fourth, and finally, I provide relevant facts that support the Motions, which I believe are critical to ensure the least possible disruption to Companies' ongoing business operations and chances for success in this case.

### Companies' Business Operations

8.      Collectively, the Companies provide ground transportation, freight forwarding, and logistics services, all on a national, regional and local basis. They operate in all 48 contiguous states, serving the various needs of their customers with various forms of supply chain solutions.

9.      The Companies each manage a different segment of the operations. Transport and SJS are the operators through which the Companies' freight forwarding service revenue is derived. Diesel provides truck and equipment repair services to Transport as well as to third-party companies, with a specialization in Volvo trucks. Holding is a real estate holding company that owns the primary real estate from which the Companies operate.

10.      Transport owns trucks and trailers as further detailed below. Its primary source of revenue is from freight forwarding, where it engages with brokers to obtain freight that needs to be delivered. Through the strategic leasing of warehouse space in Columbus, Ohio, and in California, Transport can provide reliable cross-country delivery hauling for freight.

11.      SJS provides the same freight forwarding services as Transport but does not own any equipment. Rather, SJS contracts with owner-operators that drive their own trucks but haul the Debtors' freight.

12.      As with any hauling company, the ongoing use of trucks and equipment requires advance and emergency maintenance. Diesel provides those services, allowing for Transport to obtain repairs to its fleet at a lower cost, while also obtaining revenue from third parties that recognize the expertise Diesel has in its industry.

13.      The filings of these cases were precipitated by a variety of factors, the most significant being the loss of a large customer by Transport at the end of 2019 followed by the onset of the COVID-19 pandemic. The lost customer was Dean Foods, which filed its own bankruptcy

in 2019. At that time, Transport had factored approximately $190,000 in receivables from Dean Foods which were not paid in the bankruptcy, requiring Transport to work with its factoring company to repay the prior advances made against those receivables. Transport was able to repay those amounts, but that effort left it in a precarious financial position when the pandemic hit. The Companies were not spared from the revenue disruptions caused by the various government and industry shutdowns. In addition, the Companies have been affected by a crippling industry shortage of qualified drivers and usable trailers.

14.     Despite these hardships, the Companies' revenue streams have been consistently returning in recent months. The Companies' financial issues are not a result of lack of demand; their warehouses are generally full and there are opportunities to obtain freight through brokerage services. Rather, it is a shortage of drivers and trailers that has limited the Companies' ability to realize upon the post-pandemic demand growth.

15.     Revenue derived from Transport and SJS's activities is approximately $300,000.00 per month. Diesel generates approximately $30,000 per month. Transport, SJS and Diesel contribute to Holding the funds that it needs to own and maintain the building. Of the revenue generated by Transport, SJS and Diesel, the largest expenditure is payroll and associated overhead, including the employment of the various drivers for the fleet. The remaining expenses of the Companies relates to outlays for utilities, leases, financing, fuel, maintenance, insurance, and the like.

16.     The Companies have sufficient revenue to meet their payroll and operating expenses, but they cannot service the debt that has accumulated in the business according to the terms of those obligations. The Companies seek to reorganize their various debt obligations through these cases.

### Companies' Assets and Debt Structure

17.    The Companies' assets consist of the hauling assets, intellectual/intangible property, receivables (Transport and SJS); maintenance assets (Diesel), and real estate (Holding). Transport owns 15 trucks and 18 trailers. The combined value of the trucks and trailers is approximately $575,000. Transport also owns equipment used for loading the trailers, such as hand jacks, pallets, and forklifts. It is a tenant for leased space within a warehouse facility in California located at 14600 Innovation Drive, Riverside, CA 92508 (the "California Warehouse"). The California Warehouse is a large building, out of which Transport leases 3,000 square feet of warehouse space with two loading docks, and 185 square feet of office space. Transport also owns computer equipment and office furniture, intellectual property associated with its services, and certain accounts receivable. SJS owns its bank accounts and certain accounts receivable.

18.    Holding owns the real property located at 445 Commerce Square, Columbus, OH 43228, Franklin County parcel no. 010-143087-00 (the "Commerce Square Property"). The Commerce Square Property has an 11,500 square foot building consisting of 9,900 square feet of warehousing space with a loading dock, and 1,600 square feet of office space. There is also approximately 15,000 square feet of paved surface lot surrounding the building. In addition, Holding owns the adjacent property located at 435 Commerce Square, Columbus, OH 43228, Franklin County parcel no. 010-143088-00, which is a 0.992-acre empty lot used for an equipment yard that is rented on occasion to other trucking companies for vehicle storage. An image of both parcels from 2020 as depicted by the Franklin County Auditor follows[1]:

---

[1] This image is for reference only and does not represent a depiction of the Companies' rolling and non-powered assets.



19.     For reference, the Commerce Square Property is located near West Broad Street and I-270, just south of the Hollywood Casino Columbus.

20.     SJS also leases part of the real property located at 2201 Westbelt Drive, Columbus, Ohio 43228 (the "Westbelt Property"). The Westbelt Property is located in an industrial and shipping center at the southwest corner of Roberts Road and I-270.

21.     Both Transport and SJS complete warehousing functions that complement the freight services. At their warehouses, Transport and SJS receive freight from customers, store it on a short-term basis, and then consolidate the freight into trailers for efficient hauling. The trailers filled by the Debtors' may be hauled by third parties or directly by Transport or SJS, depending on the availability of trucks and drivers.

22.     Diesel's assets consist of tools and equipment used for truck and trailer repair, and inventory used in the maintenance process. The approximate value of Diesel's tools and inventory is $90,000. Included among those assets is hardware purchased for the vehicle diagnostic services.

23.     The Companies have pre-petition bank accounts at First Financial Bank ("FFB"), CF Bank, and Clover Bank.

24.     The Companies' debts consist of both secured and unsecured debt. The secured debt consists of obligations to FFB (related to rolling stock and the Commerce Square Property), the Small Business Administration ("SBA") (a second mortgage on the Commerce Square Property serviced by Wells Fargo Bank), Delage Landen Financial Service, Inc. ("Delage Landen") (related to two trucks), and CarrierNet Group Financial, Inc. ("CarrierNet") (Transport and SJS's factoring company). The unsecured debts are general trade creditors, operating obligations (utilities, etc.), and several credit cards.

### FFB Obligations

25.     The obligations to FFB arose out of an effort of the Companies to consolidate many loans in 2017. Prior to the Companies' relationship with FFB, there were multiple outstanding equipment loans from Volvo and GE Financial, and the principal FFB loan was used to consolidate those obligations.

26.     The obligations to FFB are as follows:

a.      A note dated March 3, 2017, in the original amount of $1,718,940.00 executed by Transport and Holding, having a current balance of approximately $854,000.00 ("FFB Note 1"). FFB Note 1 was used primarily to consolidate various equipment loans. Diesel is a guarantor of FFB Note 1.

b.   A note dated May 14, 2018, in the original amount of $265,000.00[2],
executed by Transport and Holding, having a current balance of
approximately $252,000.00 ("FFB Note 2"). FFB Note 2 was used to
purchase the Commerce Square Property. Diesel is a guarantor of FFB
Note 2.

c.   A note dated October 27, 2017, in the original amount of $80,000.00
executed by all three of the Companies as co-obligors, having a current
balance of approximately $20,000.00 ("FFB Note 3"). FFB Note 3 was used
to purchase tools and equipment for Diesel.

d.   A note dated November 25, 2020, in the original amount of $35,652.06
executed by Transport, having a current balance of approximately
$28,000.00 ("FFB Note 4"). Holding and Diesel are guarantors of FFB
Note 4.

27.   SJS has guaranteed all of the foregoing obligations.

28.   FFB has filed or recorded the following documents to allegedly perfect its interests
in the Companies' assets:

a.   An *Open-End Mortgage* dated February 28, 2017, relating to the Commerce
Square Property,[3] which was recorded with the Franklin County Recorder
as Instrument Number 201703030030041.

---

[2] The original obligation for FFB Note 2 was a $450,500 note dated on or about February 28, 2017, which obligation
was restated through the reduced FFB Note 2.

[3] For the avoidance of doubt, the mortgage refers to the property at 445 Commerce Square but does not reference the
yard lot at 435 Commerce Square.

      b.     UCC Financing Statement No. OH00208579782 filed on March 2, 2017, against Transport and claiming a lien on all of Transport's assets.

      c.     UCC Financing Statement No. OH00216116297 filed on October 26, 2017, against Diesel and claiming a lien on all of Diesel's assets.

      d.     UCC Financing Statement No. OH00216115518 filed on October 26, 2017, against SJS and claiming a lien on all of SJS's assets.

      e.     Liens noted on various truck and trailer titles.

29.     Notwithstanding the expansive collateral description in the various UCC Financing Statement, the security interest granted in the *Security Agreement* executed by Transport in favor of FFB does not cover all assets of Transport. A copy of the Transport Security Agreement is attached to this declaration as <u>Exhibit A</u>, and clearly indicates that FFB's security interest only extends to equipment, inventory, titled motor vehicles, chattel paper, and general intangibles. It does not apply to fixtures, accounts, instruments, deposit accounts, or investment property. To the best of my recollection, no further security agreements were executed by any of the Companies in favor of FFB.

## SBA Loan

30.     In May 2018, Holding and Transport entered into a new loan transaction with the SBA in the total amount of $193,000.00 (the "SBA Loan") which was used to reduce the amount owed to FFB on the Commerce Square Property mortgage.

31.     The SBA Loan is secured by a second position mortgage dated May 14, 2018, recorded with the Franklin County Recorder's Office as Instrument No. 201805220067462.

32.     The SBA Loan is serviced by Wells Fargo. The present balance is approximately $164,000.00.

### Delage Landen

33.     In late 2018, Transport purchased two trucks and financed the purchase through

Delage Landen. The liens of Delage Landen are notated on the respective truck titles.

34.     Presently, Delage Landen is owed approximately $24,571.41.

### CarrierNet

35.     Receivable factoring arrangements are common in the transportation service

industry. Transport is no exception. Since it was created in 2011, Transport has maintained a

receivable factoring arrangement with CarrierNet. It entered into a *Billing, Collecting and

Settlement Agreement* with CarrierNet on September 26, 2011, through which Transport sells

various receivables to CarrierNet for an immediate payment of the amount owed. CarrierNet then

collects the receivables through direct payment from the customer, and after it retains its fees and

a percentage of the collections, it pays a reserve to Transport. When SJS was formed in 2013, it

also entered a factoring arrangement with CarrierNet on October 18, 2013, upon substantially the

same terms and conditions as the agreement between CarrierNet and Transport.

36.     Due to the long-standing relationship between the Companies and CarrierNet, the

collection percentage that CarrierNet retains on each purchased receivable is only 2%. Under the

agreement, Transport and SJS remain responsible for unpaid receivables, but the number of unpaid

invoices is historically very low.

37.     As an example, under the pre-petition agreement with CarrierNet, a $10,000.00

receivable factored by Transport with CarrierNet would result in Transport receiving an immediate

"advance payment" of 90% of the face receivable value: $9,000.00. Upon payment of the advance,

the receivable would be transferred to CarrierNet and the customer would pay CarrierNet directly

for the entire $10,000.00 amount of the invoice. Once the invoice is paid to CarrierNet, it will

retain the amount of the advance—$9,000—and then its 2% fee would be paid out of the $1,000

difference between the invoice amount and the advance. In this instance, the 2% fee would be

$200.00, leaving $800.00 that is maintained by CarrierNet in a "reserve" account. The reserve is

held by CarrierNet as security for uncollectable receivables. On a regular basis, as receivables are

paid, CarrierNet will release a portion of the reserve back to Transport.

38.    As of the petition date, the reserve account with CarrierNet was approximately

$194,496.42 for Transport and $29,395.55 for Transport. To further secure their obligations to

CarrierNet, Transport and SJS granted CarrierNet a security interest in all of their assets including,

without limitation, accounts. The lien against Transport was allegedly perfected through the filing

of a UCC Financing Statement on September 30, 2011, as OH00153220818, which was renewed

through subsequent amendment filings on June 14, 2016 (OH00202018586) and June 4, 2021

(SR715352). It does not appear that any UCC financing statement was filed by CarrierNet as to

SJS's assets.

<b>Filing Considerations</b>

39.    There are two main considerations that led to the timing and filing of the cases.

First and foremost, the Companies are in default and unable to pay their lenders, primarily FFB,

on the current loan terms. The Companies and FFB were engaged in negotiations for a forbearance

agreement in May 2021, but the negotiations were unsuccessful. Since then, FFB has filed cognovit

lawsuits against the Companies, engaged in attempted self-help recovery of its collateral, and

commenced execution proceedings. The Companies have also fallen behind with certain unsecured

creditor obligations.

40.      Second, the cases are being filed at a time when the Companies believe the challenges of the pandemic have begun to subside. While there are still industry-wide challenges in hiring, training and retaining drivers, as well as a shortage of non-powered assets (i.e., trailers), the Companies believe that now is the appropriate time to begin the restructuring process under chapter 11.

### The Companies' Motions

41.      With the filing of these cases, the Companies are filing the following Motions:

    a.      **Joint Administration Motion:** *Debtors' Motion for Joint Administration of Chapter 11 Cases* (Doc. 7)

    b.      **Post-Petition Financing and Cash Collateral Motion:** *Motion of 5AAB Transport, LLC, and SJS Transpor,t LLC, to (1) Authorize Post-Petition Financing and Use of Cash Collateral, (2) Grant Liens and Super-Priority Administrative Expense Status, (3) Modify the Automatic Stay, and (4) Approve Notice for Final Hearing*

    c.      **Wage Motion:** *Debtors' Motion for Authority to (1) Pay Certain Prepetition Employee Compensation and Related Items; (2) Pay Certain Prepetition Payroll Deductions; and (3) Pay All Related Expenses* (the "Wage Motion");

    d.      **Critical Vendor Motion:** *Debtors' Motion for Authorization to Pay Prepetition Claims of Critical Vendors*

    e.      **Utility Motion:** *Debtors' Motion for Interim and Final Orders (1) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services to the Debtor; (2) Deeming Utility Providers Adequately Assured*

*of Future Performance; and (3) Establishing Procedures to Determine Requests for Adequate Assurance of Payment*

f.   **Trust Tax Motion:** *Debtors' Motion for Authorization to Pay Pre-Petition Trust Fund Taxes*

g.   **Bank Account Motion:** *Debtors' Motion for Authority to Temporarily Continue Use of Prepetition Bank Accounts*

h.   **Expedited Hearing Motion:** *Debtors' Motion for an Order Scheduling Expedited Hearings on Certain First Day Motions*

i.   **Bar Date Motion:** *Debtors' Motion to Set Bar Date for Filing Proofs of Claim*; and

j.   **Employment Application:** *Application to Employ Allen Stovall Neuman & Ashton LLP as Bankruptcy Counsel to the Debtors.*

42.   **Joint Administration Motion:** Through the Joint Administration Motion, the Companies are seeking to have the Court enter an order permitting the joint administration of the Companies' cases. Joint administration of these cases will eliminate many administrative costs and burdens that would arise from the management of separate proceedings.

43.   **Post-Petition Financing and Cash Collateral Motion:** Through the Post-Petition Financing and Cash Collateral Motion, the Companies are seeking authority to continue their relationship with CarrierNet for the ongoing, post-petition factoring of accounts receivable generated by Transport and SJS on the same general terms and provisions as they existed on a pre-petition basis. Because CarrierNet also holds a lien on the Transport's assets, including its accounts, the Companies seek authority to use any cash collateral of CarrierNet existing as of the petition date, and to have the Court approve their initial operating budget as a form of adequate

protection for such use.

44.      **Wage Motion:** Through the Wage Motion, the Companies seek authority to pay the pre-petition wages of their employees and independent contractors. The employees and independent contractors of the Companies have provided approximately one week of services to the Companies prior to the filing of these cases, and due to the critical need for the Companies to retain their staffs, the Companies seek authority to pay all pre-petition wage and benefit obligations. In addition, the Companies are seeking to pay any expenses and tax obligations related to payroll in the ordinary course of their business.

45.      **Critical Vendor Motion:** Certain of the Companies vendors are critical to the Companies' operations. Any delay or disruption of service may result in significant losses to the Companies. As a result, the Companies are seeking authority to pay certain critical vendors the amounts that they were owed prior to the filing of these cases.

46.      **Utility Motion:** Similarly, the Companies cannot operate without ongoing utility service. Through the Utility Motion, the Companies seek to prohibit any utility service provider from discontinuing service to the Companies, and to have the Court establish a protocol for determining adequate assurance payments.

47.      **Trust Tax Motion:** The Companies collect withholding and sales taxes that are property of the state and federal governments. Through this motion, the Companies seek authority to pay those trust fund taxes, including prepetition amounts, in the ordinary course of business.

48.      **Bank Account Motion**: The Companies will be immediately seeking to open debtor in possession bank accounts. However, due to recent difficulty experienced by the Companies' counsel in other cases in obtaining new accounts for other debtors, the Companies are seeking authority, out of an abundance of caution, to maintain their accounts while new debtor in

possession accounts are established, as well as to complete certain payments that may be authorized through other first days motions prior to the opening of debtor in possession bank accounts.

49.    **Expedited Hearing Motion**: As is typical for first day motions, the Companies require expedited relief in order to ensure the Companies can timely meet their operating needs, including the next payroll that is due to be funded on June 24, 2021.

50.    **Bar Date Motion:** Through the Bar Date Motion, the Companies seek to have the Court set a date for the filing of proofs of claim. This will ensure that the Companies have information about all potential claims within a timeframe that will help facilitate the filing of a plan or plans of reorganization. No expedited hearing is requested for this motion.

51.    **Employment Application**: Finally, through the Employment Application, the Companies seek authority to hire the law firm of Allen Stovall Neuman & Ashton LLP, and attorneys Thomas R. Allen, Richard K. Stovall and James A. Coutinho, in particular. No expedited hearing is requested for this application.

52.    Having reviewed the Motions, I believe the information they contain is accurate and correct, and the relief they seek is necessary to avoid disruption and irreparable harm to Companies and their estates.

Respectfully submitted,

 /s/  Hardeep Singh
Hardeep Singh
Member, 5AAB Transport, LLC
Member, 5AAB Holding, LLC
Member, SJS Transport, LLC
Member, Heavy Diesel Service, LLC

 /s/  James A. Coutinho
Thomas R. Allen        (0017513)
Richard K. Stovall      (0029978)

James A. Coutinho      (0082430)
Allen Stovall Neuman & Ashton LLP
17 South High Street, Suite 1220
Columbus, Ohio 43215
T: (614) 221-8500      F: (614) 221-5988
allen@ASNAlaw.com; stovall@ASNAlaw.com;
coutinho@ASNAlaw.com
*Proposed Counsel for Companies*



**EXHIBIT A
Page 1 of 4**

U.S. Small Business Administration

# SECURITY AGREEMENT

LIEN RECORDED
TITLE NO. 21-041-9128

JUN 14 2017

NATALIE FRAVEL
DELAWARE COUNTY, OHIO

| | |
|---|---|
| SBA Loan # | ████████████ |
| SBA Loan Name | 5AAB Transport, LLC |
| Debtor<br>*(Exact full legal name of individual(s), corporation, LLC, partnership, or other organization)* | 5AAB Transport, LLC |
| Borrower | 5AAB Transport, LLC and 5AAB Holding LLC |
| Secured Party | First Financial Bank |
| Date | 03-03-2017 |
| Loan Amount | $1,718,940.00 |

## 1. DEFINITIONS.

Unless otherwise specified, all terms used in this Agreement will have the meanings ascribed to them under the Official Text of the Uniform Commercial Code, as it may be amended from time to time, ("UCC"). "SBA" means the Small Business Administration, an Agency of the U.S. Government.

## 2. GRANT OF SECURITY INTEREST.

For value received, the Debtor grants to the Secured Party a security interest in the property described below in paragraph 4 (the "Collateral").

## 3. OBLIGATIONS SECURED.

This Agreement secures the payment and performance of: (a) all obligations under a Note dated March 3, 2017, made by 5AAB Transport, LLC and 5AAB Holding LLC, made payable to First Financial Bank, in the amount of $1,718,940.00 ("Note"), including all costs and expenses (including reasonable attorney's fees), incurred by Secured Party in the disbursement, administration, and collection of the loan evidenced by the Note; (b) all costs and expenses (including reasonable attorney's fees), incurred by Secured Party in the protection, maintenance, and enforcement of the security interest hereby granted; (c) all obligations of the Debtor in any other agreement relating to the Note; and (d) any modifications, renewals, refinancings, or extensions of the foregoing obligations.The Note and all other obligations secured hereby are collectively called the "Obligations."

## 4. COLLATERAL DESCRIPTION.

The Collateral in which this security interest is granted is all of the Debtor's property described below, and indicated by an "X" or other mark on the applicable line, now owned or hereafter acquired, together with all replacements, accessions, proceeds, and products.

# EXHIBIT A
## Page 2 of 4

[X] a. Equipment                               [X] f. Chattel paper

[ ] b. Fixtures                                [X] g. General intangibles

[X] c. Inventory                               [ ] h. Farm products

[ ] d. Accounts                                [ ] i. Deposit accounts

[ ] e. Instruments                             [ ] j. Investment property

[X] l. Titled motor vehicles, including mobile or manufactured homes (list make, model, and serial #):
See Attached Exhibit, which is incorporated herein by reference,

[ ] m. Other: Insert specific description of other forms of Collateral not included in categories a through k above (for example, specific commercial tort claim, letter-of-credit rights):

## 5. RESTRICTIONS ON COLLATERAL TRANSFER.

Debtor will not sell, lease, license or otherwise transfer (including by granting security interests, liens, or other encumbrances in) all or any part of the Collateral or Debtor's interest in the Collateral without Secured Party's written or electronically communicated approval, except that Debtor may sell inventory in the ordinary course of business on customary terms. Debtor may collect and use amounts due on accounts and other rights to payment arising or created in the ordinary course of business, until notified otherwise by Secured Party in writing or by electronic communication.

## 6. MAINTENANCE AND LOCATION OF COLLATERAL; INSPECTION; INSURANCE.

Debtor must promptly notify Secured Party by written or electronic communication of any change in location of Collateral, specifying the new location. Debtor hereby grants to Secured Party the right to inspect the Collateral at all reasonable times and upon reasonable notice. Debtor must: (a) maintain the Collateral in good condition; (b) pay promptly all taxes, judgments, or charges of any kind levied or assessed thereon; (c) keep current all rent or mortgage payments due, if any, on premises where the Collateral is located; and (d) maintain hazard insurance on the Collateral, with an insurance company and in an amount approved by Secured Party (but in no event less than the replacement cost of that Collateral), and including such terms as Secured Party may require including a Lender's Loss Payable Clause in favor of the Secured Party. Debtor hereby assigns to Secured Party any proceeds of such policies and all unearned premiums thereon and authorizes and empowers Secured Party to collect such sums and to execute and endorse in Debtor's name all proofs of loss, drafts, checks and any other documents necessary for Secured Party to obtain such payments.

## 7. CHANGES TO DEBTOR'S LEGAL STRUCTURE, PLACE OF BUSINESS, JURISDICTION OF ORGANIZATION, OR NAME.

Debtor must notify Secured Party by written or electronic communication not less than 30 days before taking any of the following actions: (a) changing or reorganizing the type of organization or form under which it does business; (b) moving, changing its place of business or adding a place of business; (c) changing its jurisdiction of organization; or (d) changing its name. Debtor will pay for the preparation and filing of all documents, Secured Party deems necessary to maintain, perfect and continue the perfection of Secured Party's security interest in the event of any such change.

## 8. PERFECTION OF SECURITY INTEREST.

Debtor consents, without further notice, to Secured Party's filing or recording of any documents necessary to perfect, continue, amend or terminate its security interest. Upon request of Secured Party, Debtor must sign or otherwise authenticate all documents that Secured Party deems necessary at any time to allow Secured Party to acquire, perfect, continue or amend its security interest in the Collateral. Debtor will pay the filing and recording costs of any documents relating to Secured Party's security interest. Debtor ratifies all previous filings and recordings, including financing statements and notations on certificates of title. Debtor will cooperate with Secured Party in obtaining a Control Agreement satisfactory to Secured Party with respect to any Deposit Accounts or Investment Property, or in otherwise obtaining control or possession of that or any other Collateral.

## 9. DEFAULT.

Debtor is in default under this Agreement if: (a) Debtor fails to pay, perform or otherwise comply with any provision of this Agreement; (b) Debtor makes any materially false representation, warranty or certification in, or in connection with, this Agreement, the Note, or any other agreement related to the Note or this Agreement; (c) another secured party or judgment creditor exercises its rights against the Collateral; or (d) an event defined as a "default" under the Obligations occurs. In the event of default and if Secured Party requests, Debtor must assemble and make available all Collateral at a place and time designated by Secured Party. Upon default and at any time thereafter, Secured Party may declare all Obligations secured hereby immediately due and payable, and, in its sole discretion, may proceed to enforce payment of same and exercise any of the rights and remedies available to a secured party by law including those available to it under Article 9 of the UCC that is in effect in the jurisdiction where Debtor or the Collateral is located. Unless otherwise required under applicable law, Secured Party has no obligation to clean or otherwise prepare the Collateral for sale or other disposition and Debtor waives any right it may have to require Secured Party to enforce the security interest or payment or performance of the Obligations against any other person.

## 10. FEDERAL RIGHTS.

When SBA is the holder of the Note, this Agreement will be construed and enforced under federal law, including SBA regulations. Secured Party or SBA may use state or local procedures for filing papers, recording documents, giving notice, enforcing security interests or liens, and for any other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control penalty, tax or liability. As to this Agreement, Debtor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

## 11. GOVERNING LAW.

Unless SBA is the holder of the Note, in which case federal law will govern, Debtor and Secured Party agree that this Agreement will be governed by the laws of the jurisdiction where the Debtor is located, including the UCC as in effect in such jurisdiction and without reference to its conflicts of laws principles.

## 12. SECURED PARTY RIGHTS.

All rights conferred in this Agreement on Secured Party are in addition to those granted to it by law and all rights are cumulative and may be exercised simultaneously. Failure of Secured Party to enforce any rights or remedies will not constitute an estoppel or waiver of Secured Party's ability to exercise such rights or remedies. Unless otherwise required under applicable law, Secured Party is not liable for any loss or damage to Collateral in its possession or under its control, nor will such loss or damage reduce or discharge the Obligations that are due, even if Secured Party's actions or inactions caused or in any way contributed to such loss or damage.

**13. SEVERABILITY.**

If any provision of this Agreement is unenforceable, all other provisions remain in effect.

**14. DEBTOR CERTIFICATIONS.**

Debtor certifies that: (a) its Name (or Names) as stated above is correct; (b) all Collateral is owned or titled in the Debtor's name and not in the name of any other organization or individual; (c) Debtor has the legal authority to grant the security interest in the Collateral; (d) Debtor's ownership in or title to the Collateral is free of all adverse claims, liens, or security interests (unless expressly permitted by Secured Party); (e) none of the Obligations are or will be primarily for personal, family or household purposes; (f) none of the Collateral is or will be used, or has been or will be bought primarily for personal, family or household purposes; and (g) Debtor has read and understands the meaning and effect of all terms of this Agreement.

**15. DEBTOR NAME(S) AND SIGNATURE(S).**

By signing or otherwise authenticating below, each individual and each organization becomes jointly and severally obligated as a Debtor under this Agreement.

GRANTOR:

5AAB Transport, LLC

By _____
Hardeep Singh, Partner of 5AAB Transport, LLC

By _____
Navdeep Sidhu, Partner of 5AAB Transport, LLC

I certify this is a true and exact copy of the original.

Laura K Nethers
Notary Public
In and For the State of Ohio
My Commission Expires
30 July 2020

| Exhibit A |
|---|
| 1UYVS2539EG007138 |
| 4V4NC9EH5GN940781 |
| 1UYVS2530HG812501 |
| 1UYVS2532HG812502 |
| 1UYVS2534HG812503 |
| 1UYVS2530FP326915 |
| 1UYVS2532FP326916 |
| 1UYCS2535FG217950 |
| 1UYVS2539FG217949 |
| 1UYVS2537GG429654 |
| 1UYVS2535GG429653 |
| 1UYVS2539GG579040 |
| 1UYVS2532GG579039 |
| 1UYVS2530GG579038 |
| 1UYVS2534EG007130 |
| 1UYVS2538EP038512 |
| 1UYVS2539GG429655 |
| 1UYVS2530GG429656 |
| 4V4NC9EHXFN190258 |
| 4V4NC9EH4FN190255 |
| 4V4NC9EH8FN190260 |
| 4V4NC9EH1FN190259 |
| 1UYVS2536EG893032 |
| 3HSDJSJR4CN553292 |
| 3HSDJSJR7CN553156 |
| 4V4NC9EH6FN190256 |
| 4V4NC9EH8FN190257 |
| 4V4NC9EH0GN940784 |
| 4V4NC9EH3GN940780 |
| 4V4NC9EH7GN940782 |
| 4V4NC9EH9GN940783 |
| 4V4NC9EH8FN188959 |
| 4V4NC9EH0FN914961 |
| 3HSCUAPR5AN063364 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing *Declaration of Hardeep Singh* was served (i) electronically on the date of filing through the court's ECF System on all ECF participants registered in this case at the email address registered with the court and (ii) by ordinary U.S. Mail on June 21, 2021, addressed to:

None.

        /s/  James A. Coutinho
        James A. Coutinho     (0082430)