# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No: 21-52150 |
| 5AAB Transport, LLC, *et al.* | : | Chapter 11 |
| | : | Judge John E. Hoffman, Jr. |
| Debtors. | : | |
| | : | Joint Administration Requested |

## MOTION OF 5AAB TRANSPORT, LLC, AND SJS TRANSPORT, LLC, TO (1) AUTHORIZE POST-PETITION FINANCING AND USE OF CASH COLLATERAL, (2) GRANT LIENS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (3) MODIFY THE AUTOMATIC STAY, AND (4) APPROVE NOTICE FOR FINAL HEARING

5AAB Transport, LLC ("Transport"), and SJS Transport, LLC ("SJS," together with Transport, the "Debtors"), the debtors and debtors in possession, pursuant 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507, and Rules 2002, 4001,6004 and 9014 of the Federal Rules of Bankruptcy Procedure, move for entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final DIP Order") authorizing the Debtors to, among other things:

(i)      Obtain senior secured post-petition financing (the "DIP Financing") pursuant to the terms and conditions of the Pre-Petition Agreements (as defined below), the Interim Order, and the Final DIP Order;

(ii)      Authorize the continued funding of the Debtors' operations, on an interim and final basis, pursuant to pre-petition factoring agreements between CarrierNet Group Financial, Inc. ("CarrierNet" or the "DIP Lender"), and the Debtors (together, the "Pre-Petition Agreements," copies of which are attached as Exhibits B and C for Transport and SJS, respectively);

(iii)      Grant to the DIP Lender allowed super-priority administrative expense claims in these chapter 11 cases for the DIP Financing subject to the priorities set forth in paragraph 2(d) below;

(iv)      Grant to the DIP Lender automatically perfected security interests in and liens on all of the collateral described in the Pre-Petition Agreements, including, without limitation, all property constituting "cash collateral" (as defined in 11 U.S.C. § 363(a), "Cash Collateral"), which liens shall be subject to the priorities set forth in paragraph 2(d) below;

(v)      Obtain authorization to use the proceeds of the DIP Financing in accordance with the Debtor's initial 13-week budget, a copy of which is attached hereto as Exhibit D (the "Budget");

(vi)      Obtain authorization to use Cash Collateral of the DIP Lender in accordance with the Budget;

(vii)      Extend the Budget period with approval of the DIP Lender but without further order of the Court;

(viii)      Provide adequate protection to the DIP Lender pursuant to the terms of the Interim Order and the Final DIP Order for any diminution in value of its interests in the Pre-Petition Collateral (as defined below) of the Debtors, including any Cash Collateral;

(ix)      Modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the Interim Order and the Final DIP Order;

(x)      Schedule a final hearing (the "Final Hearing") to consider entry of the Final DIP Order granting the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

2

(xi)    Waive any applicable stay as provided in the Bankruptcy Rules and to provide for immediate effectiveness of the Interim Order.

Pursuant to LBR 9013-1(a)(1)(C)(iii), because the Debtors are seeking an expedited hearing on this matter, no twenty-one-day notice is attached, and a separate certificate of service will be filed. A proposed order granting this motion is attached as Exhibit A.

Respectfully submitted,

 /s/  James A. Coutinho
Thomas R. Allen        (0017513)
Richard K. Stovall      (0029978)
James A. Coutinho      (0082430)
Allen Stovall Neuman & Ashton LLP
17 South High Street, Suite 1220
Columbus, Ohio 43215
T: (614) 221-8500      F: (614) 221-5988
allen@ASNAlaw.com; stovall@ASNAlaw.com;
coutinho@ASNAlaw.com
*Proposed Counsel for Debtors/Debtors in Possession*

## BANKRUPTCY RULE 4001 CONCISE STATEMENT

1.      By this Motion, the Debtors request:

     a.      Entry of a proposed Interim Order and a Final DIP Order authorizing the Debtors:

         i.      to obtain post-petition financing pursuant to Sections 363 and 364 of the Bankruptcy Code by authorizing the continued funding of the Debtors' operations pursuant to the Pre-Petition Agreements with the DIP Lender;

         ii.      to obtain the use of Cash Collateral on the terms set forth in the Interim Order and the Final DIP Order and as set forth in the Budget, with authority to extend the period of the Budget by agreement with the DIP Lender but without further Court approval; and,

         iii.      to grant liens and super-priority claims in favor of the DIP Lender to secure the DIP Financing, in addition to adequate protection to DIP Lender in the form of replacement liens and super-priority claims.

     b.      In accordance with Bankruptcy Rule 4001(c)(2), that this Court schedule the Final Hearing and approve the form notice of the Final Hearing.

2.      The material provisions of the proposed DIP Financing are summarized as follows and set forth in the following sections of the Interim Order:[1]

     a.      **Borrowers:** The Debtors[2]

     b.      **Lender:** CarrierNet

     c.      **Purpose:** The proceeds of the DIP Financing are to fund operations of the Debtors throughout their bankruptcy cases.

     d.      **Priority and Liens:** All amounts owed by the Debtors under the Pre-Petition Agreements and the Interim Order at all times will, pursuant to Section 364(c)(1) of the Bankruptcy Code, have priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code, and will be collateralized by:

---

[1] Attached hereto as Exhibit E is the checklist required pursuant to LBR 4001-2.

[2] Co-debtors Heavy Diesel Service, LLC ("Diesel"), and 5AAB Holding, LLC ("Holding"), both affiliates of the Debtors have filed their respective chapter 11 cases jointly with the Debtors' cases. Neither Diesel nor Holding have pre-petition receivable factoring arrangements and do not need to factor receivables on a post-petition basis.

      i.       pursuant to Section 364(c)(2) of the Bankruptcy Code, a first- priority, perfected lien upon all of the Debtors' right, title, and interest in, to, and under all of the Debtors' accounts receivable and any other of the Debtors' assets not otherwise subject to a lien, and

      ii.      pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior perfected lien upon any asset of the Debtors that is already subject to a valid and perfected lien.

e.     **Carve-Outs:** The Interim Order provides that the liens and security interests granted to the DIP Lender will be valid, enforceable, and perfected security interests and liens, but shall be subject and subordinate to i) allowed claims of professionals of the Debtors, to the extent such claims are set forth in the Budget, plus an additional $20,000 from and after any Event of Default, ii) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, and iii) the fees of the Subchapter V Trustee (the "Carve-Out").

f.     **Events of Default:** The Events of Default set forth in the Pre-Petition Agreements and Interim Order.

g.     **Waiver of Applicable Non-Bankruptcy Law Relating to Perfection:** The Interim Order is deemed to be sufficient and conclusive evidence of the priority, perfection, and validity of the post-petition liens and security interests granted therein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the subject collateral, or other act to validate or perfect such security interest or lien.

h.     **Relief From Automatic Stay:** The automatic stay provisions of Section 362 of the Bankruptcy Code will be modified to the extent necessary to implement the terms and conditions of the Interim Order and Final DIP Order, and to enforce certain remedies against the Post-Petition Collateral and the account debtors thereof, without having to obtain any further order of the Bankruptcy Court.

i.     **Application of Proceeds of Collateral:** From and after the date of entry of the Interim Order and thereafter, the proceeds of the DIP Financing shall not be used to pay expenses of the Debtor or otherwise disbursed except for those expenses and/or disbursements that are expressly permitted under the Budget.

j.     **Waiver of Section 506(c) Surcharge:** The Debtor shall not assert a claim under Section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection, or enhancement of, or realization by the DIP Lender upon the Post-Petition Collateral.

## MEMORANDUM IN SUPPORT

## I.      JURISDICTION AND BACKGROUND INFORMATION

1.      On June 21, 2021 (the "Petition Date"), Transport, SJS, Diesel and Holding (together, the "Companies"), commenced these cases by filing voluntary petitions for relief under chapter 11 the Bankruptcy Code. Transport, SJS, and Diesel have elected treatment under subchapter V of chapter 11. Each of the Companies has continued in the possession of their property and are operating and managing their business as debtors in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

2.      This Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334 and the General Order of Reference entered in this district.

3.      Venue is proper under 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief sought herein are 11 U.S.C. § 105(a), 361, 363, and 364, and Bankruptcy Rules 4001, 6004, and 9014.

5.      The Companies are Ohio limited liability companies owned and operated by Hardeep Singh and Navdeep Sidhu. The Companies provide ground transportation, freight forwarding, and logistics services, all on a national, regional and local basis. They operate in all 48 contiguous states, serving the needs of their customers with various forms of supply chain solutions.

6.      The Companies each manage a different segment of the operations. Transport and SJS are the operators through which the Companies' freight forwarding service revenue is derived. Diesel provides truck and equipment repair services to Transport as well as to third-party companies, with a specialization in Volvo trucks. Holding is a real estate holding company that

owns the primary real estate from which the Companies operate.

7.      The Companies have experienced financial hardship due to multiple factors, including the loss of a large customer at the end of 2019 followed by the onset of the COVID-19 pandemic. The Companies seek to restructure through the filing of those chapter 11 proceedings and intend to submit a plan or plans of reorganization.

8.      In conjunction with the filing of these cases, the Companies filed the *Declaration of Hardeep Singh* (Doc. 8) (the "Singh Declaration") which provides additional details about the background of the Companies and the matters that have led to the filing of these cases. Reference is made to the Singh Declaration, which is incorporated herein.

9.      Currently, Transport and SJS generate a combined amount of approximately $300,000 a month in revenue and have operational expenses of approximately $265,000 a month (not including restructuring costs and debt service obligations).

10.     Receivable factoring arrangements are common in the transportation service industry. Transport and SJS are no exceptions. Since it was created in 2011, Transport has maintained a receivable factoring arrangement with CarrierNet. It entered into the first of the Pre-Petition Agreements[3] with CarrierNet on September 26, 2011, through which Transport sells various receivables to CarrierNet for an immediate payment of the amount owed. CarrierNet then collects the receivables through direct payment from the customer, and after it retains its fees and a percentage of the collections, it pays a reserve to Transport. When SJS was formed in 2013, it also entered a factoring arrangement with CarrierNet on October 18, 2013, upon substantially the same terms and conditions as the agreement between CarrierNet and Transport.

---

[3] The complete name of each of the Pre-Petition Agreements is *Billing, Collecting and Settlement Agreement.*

11.     Due to the long-standing relationship between the Debtors and CarrierNet, the collection percentage that CarrierNet retains on each purchased receivable is only 2%. Under the Pre-Petition Agreements, the Debtors remain responsible for unpaid receivables, but the number of unpaid invoices is historically exceptionally low.[4]

12.     As of the Petition Date, the amounts of receivables that CarrierNet had factored with Transport and SJS but had not yet collected were $194,496.42 and $29,395.55, respectively. Under the Pre-Petition Agreements, Transport and SJS are liable to CarrierNet for any portion of the foregoing uncollected receivables that are not paid.

13.     To secure a portion of the obligations of Transport and SJS to repay unpaid receivables, CarrierNet holds an amount in reserve that is released when a given invoice is collected. As of the Petition Date, the reserve accounts for Transport and SJS were $16,537.28 and $3,780.25, respectively.

14.     To further secure the Debtors' respective obligations to CarrierNet, the Debtors each granted CarrierNet a security interest in all their respective assets including, without limitation, accounts receivable (the "Pre-Petition Collateral"). CarrierNet's lien in the Pre-Petition Collateral of Transport was perfected through the filing of a UCC Financing Statement on September 30, 2011, as OH00153220818, which was renewed through subsequent amendment filings on June 14, 2016 (OH00202018586) and June 4, 2021 (SR715352). [5]

---

[4] As an example, under the Pre-Petition Agreements with CarrierNet, a $10,000.00 receivable factored by Transport with CarrierNet would result in Transport receiving an immediate "advance payment" of 90% of the face receivable value: $9,000.00. Upon payment of the advance, the receivable would be transferred to CarrierNet and the customer would pay CarrierNet directly for the entire $10,000.00 amount of the invoice. Once the invoice is paid to CarrierNet, it will retain the amount of the advance—$9,000—and then its 2% fee would be paid out of the $1,000 difference between the invoice amount and the advance. In this instance, the 2% fee would be $200.00, leaving $800.00 that is maintained by CarrierNet in a "reserve" account. The reserve is held by CarrierNet as security for uncollectable receivables. On a regular basis, as receivables are paid, CarrierNet will release a portion of the reserve back to Transport.

[5] It does not appear that any UCC financing statement was filed by CarrierNet as to SJS's assets.

15.     As detailed below, the Debtors seek authority to continue the funding of their operations on a post-petition basis on the terms and conditions set forth in the Pre-Petition Agreements, the Interim Order and the Budget.

## II.     RELIEF REQUESTED

### A.     The Debtors' need post-petition financing to continue operations.

16.     The Debtors request authority to obtain post-petition financing from the DIP Lender. The requested relief is necessary for the Debtors to continue the operation of their businesses as debtors in possession, to preserve the going-concern value of their assets, and to minimize the disruption of the Debtors as going concerns. The Debtors will suffer immediate and irreparable harm unless they are immediately authorized to obtain financing through the continued factoring of accounts receivable with the DIP Lender on the terms and conditions set forth Pre-Petition Agreements and the Interim Order.

17.     Despite diligent efforts, the Debtors have been unable to obtain financing in the form of unsecured credit allowable under Section 503(b)(l) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a super-priority administrative expense claim pursuant to Section 364(c) of the Bankruptcy Code.

18.     Subject to the terms and conditions set forth in the Pre-Petition Agreements and the Interim Order, the DIP Lender is willing to continue advancing funds to the Debtors through the factoring of accounts receivable to allow the Debtors to continue to operate as a going concern.

### B.     Overview of relief sought by Debtors

19.     The Debtors seek authorization to obtain, on an emergency basis, secured, super-priority post-petition financing on terms as outlined in the Interim Order. Specifically, the Debtors seek the entry of the Interim Order and Final DIP Order authorizing the Debtors to (a) continue to

fund their operations under the terms and conditions outlined in the Pre-Petition Agreements with the DIP Lender, (b) obtain the post-petition financing through the continued factoring of their accounts receivable as contemplated therein, (c) pay all interest, fees, expenses, and other obligations provided for under the Pre-Petition Agreements and the Interim Order, and (d) satisfy all conditions precedent and perform all obligations thereunder in accordance with the terms thereof.

20.     A condition to the willingness of the DIP Lender to fund the advances as provided under the Pre-Petition Agreements through its continued factoring of the Debtors' accounts receivable, and as security for the prompt payment and performance of the DIP Financing and all interest, fees, expenses, and charges at any time payable by the Debtors under the Pre-Petition Agreements and the Interim Order, the Debtors propose to grant to the DIP Lender:

  a.     pursuant to Section 364(c)(2) of the Bankruptcy Code, a first-priority, perfected lien upon all the Debtors' right, title, and interest in, to, and under all of the Debtors' accounts receivable, whether generated prior to the Petition Date or thereafter, and any other of the Debtors' assets not otherwise subject to a lien (collectively, the "Priority Post-Petition Collateral"), and

  b.     pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior perfected lien upon any asset of the Debtors that is already subject to a valid and perfected lien (collectively, the "Junior Collateral").

21.     The liens described in items (a) and (b) above shall hereinafter be referred to as the "Post- Petition Liens." Notwithstanding the foregoing provisions, the Post-Petition Liens shall **not** attach to, and the Priority Post-Petition Collateral and the Junior Collateral do not include, any of the following property: (i) any causes of action, including causes of action or claims pursuant to Sections 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code (the "Avoidance Actions"); and (ii) any monies recovered in connection with the successful prosecution or settlement of Avoidance Actions or any other causes of action held by the Debtors' estates (collectively, the

"Avoidance Proceeds").

22.    Pursuant to the Interim Order, all DIP Financing will be granted administrative priority in accordance with and shall constitute an allowed super-priority claim (the "Super-Priority Claim") pursuant to the provisions of 11 U.S.C. § 364(c)(l) with priority over all other administrative expenses in the Debtors' bankruptcy cases of the kind specified in, or ordered pursuant to, 11 U.S.C. §§ 503(b) or 507(b).

23.    The Debtors also seek authority to use all Cash Collateral of the DIP Lender provided that the DIP Lender is granted adequate protection as set forth in this motion. The Debtors have been informed that the DIP Lender consents to the use of Cash Collateral subject to the terms of the Interim Order and the Final DIP Order. The Debtors also seek authority to use all Cash Collateral, regardless of whether any other creditor claims an interest in the Cash Collateral.[6]

24.    The Debtors also request that the Court grant the DIP Lender adequate protection of its interest in Cash Collateral for any diminution in value arising from or relating to the Debtor's use of Cash Collateral, as follows:

      a.    **Adequate Protection Replacement Liens**. To the extent of the diminution of value of the interests of the CarrierNet in Cash Collateral, CarrierNet will be granted replacement liens as follows:

            i.    **Replacement Liens**: Pursuant to 11 U.S.C. § 361 and 363(e), continuing valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests in and liens on all of the Debtors' assets, including assets acquired, and accounts receivable generated, after the Petition Date, excluding, however, Avoidance Actions and Avoidance Proceeds (the "Replacement

---

[6] First Financial Bank ("FFB") may claim an interest in Cash Collateral by virtue of its collateral descriptions in the various UCC Financing Statements purporting to claim a blanket lien on all the Debtor's assets. However, the security interest granted in the *Security Agreement* executed by Transport in favor of FFB does not cover all assets of the Transport. A copy of the Security Agreement signed by Transport is attached to the Singh Declaration as Exhibit A, and clearly indicates that FFB's security interest only extends to equipment, inventory, titled motor vehicles, chattel paper, and general intangibles. The Debtors do not believe SJS executed a security agreement with FFB.

Liens").

  ii. **Priority of the Replacement Liens**: The Replacement Liens shall be junior only to (i) the Carve-Out, (ii) the Post-Petition Liens; and (iii) any other valid and perfected pre-petition lien on, or security interest in, the Debtors' assets.

  b. **Adequate Protection Superpriority Claims**. To the extent of any diminution of value of the interests of CarrierNet in Cash Collateral of the Debtors, CarrierNet shall have an allowed superpriority administrative expense claim as and to the extent provided by 11 U.S.C. §§ 503(b) and 507(b) (the "Adequate Protection Superpriority Claims"). The Adequate Protection Superpriority Claims shall be junior only to the Carve-Out. Except as otherwise provided in the Interim Order, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to 11 U.S.C. §§ 503(b) and 507(b).

  25. The Debtors believe that good cause has been shown for the entry of the Interim Order to obtain the DIP Financing pending the Final Hearing on the relief requested pursuant to Bankruptcy Rules 4001(c) and (d). The Debtors' need for financing of the type requested and as afforded by the Interim Order is immediate and critical. Entry of the Interim Order will minimize disruption of the Debtors' operations and businesses as going concerns, will preserve the assets of the Debtors' estates, and is in the best interests of the Debtors, their creditors, and their estates.

26.     The Debtors further believe that the terms of the DIP Financing are fair and reasonable, reflect the Debtors' reasonable exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

27.     The continuance of the Pre-Petition Agreements with CarrierNet is necessary to maintain the value of the Debtors' assets, including going-concern value, and the ability to continue business. For the foregoing reasons, and to assure operating capital, it is necessary for the Debtors to have access to the DIP Financing through the continued factoring of their accounts receivable under the terms of the Pre-Petition Agreements and the Interim Order.

## IV.     BASIS FOR RELIEF REQUESTED

### A.     11 U.S.C. § 364(c) permits the requested relief.

28.     11 U.S.C. § 364(c) allows debtors in possession to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, and (c) obtain credit with specialized priority or with security. If a debtor in possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to super-priority administrative expense status or is secured by a lien on unencumbered property, or a combination of the foregoing.

29.     The Debtors propose to continue financing under the Pre-Petition Agreements, the Interim Order, and the Final DIP Order by providing security interests in and liens on the Priority Post Petition Collateral and the Junior Collateral under 11 U.S.C. § 364(c). The statutory requirement for obtaining post-petition credit is a finding, made after notice and hearing, that the Debtors are "unable to obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code]." *See In re Latam Airlines Group S.A.,* 620 B.R. 722, 767 (Bank. S.D. Ohio 2020); *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897,900 (Bankr. N.D. Ohio 1992) (the debtor

must show "by a good faith effort that credit was not available without" the protections of Section 364(c)). Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re Crouse Group, Inc.*, 71 B.R. 544, 549, *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (secured credit under Section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

30.     Courts have articulated a three-part test to determine whether a debtor is entitled to Section 364(c) financing:

      a.     The debtor is unable to obtain unsecured credit under Section 364(b) (i.e., by allowing a lender only an administrative claim);

      b.     The credit transaction is necessary to preserve the assets of the estate; and

      c.     The terms of the transaction are fair, reasonable, and adequate given the circumstances of the debtor and the proposed lender.

*See In re Los Angeles Dodgers LLC,* 457 B.R. 308 (Bankr. D. Del. 2011); *Crouse Group*, 71 B.R. at 549. Additionally, courts will accord significant weight to the necessity of the debtor obtaining post-petition financing to remain viable. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores*, 115 B.R. 34, 40; (Bankr. S.D.N.Y. 1990).

31.     As noted above, the need for the Debtors to obtain financing is critical. Further, the evidence at the interim hearing, if necessary, will show that a working capital facility of the type needed in this Chapter 11 case could not have been obtained on an unsecured basis.

**B.     The Debtors do not have an alternative to the DIP Financing.**

32.     If necessary, the evidence at the interim hearing will show that a financing facility of the type needed in this case could not have been obtained on an unsecured basis. Indeed, the potential sources of a credit facility for the Debtors, obtainable on an expedited basis and on

14

reasonable terms, are practically nonexistent. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co*., 789 F.2d at 1088.

33.    A debtor need only demonstrate "that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)." *Latam,* 620 B.R. at 767 *citing Ames,* 115 B.R. at 37. Where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc*., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley*, 99 B.R. 1997, 120 n.4 (N.D. Ga. 1989). Thus, the evidence introduced at the interim hearing will satisfy the requirement of section 364(c) that unsecured credit was unavailable to the Debtors.

34.    Because of the status of the Debtors' operations and collateral base, and the impracticability of pursuing (and paying for) numerous prospective lenders, the Debtors have concluded that, in their business judgment, it was not practicable to "shop" the DIP Financing to multiple, possible lenders. However, from the Debtors' perspective, the DIP Lender, which is already familiar with the Debtors' business operations, corporate structure, financing arrangements, and collateral base, was best suited to meet the Debtors' working capital needs on the terms, and within the critical time frame, that the Debtors needed.

### C.    Application of the business judgment standard.

35.    As described above, the Debtors' management has concluded that the Pre-Petition Agreements and the Interim Order provide the only viable alternative under the circumstances. Courts grant debtors in possession considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such

creditor does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g. In re Trans World Airlines, Inc.,* 163 B.R 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *Dodgers,* 457 B.R. at 313 ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *Latam,* 620 B.R. 722 ("[C]ourts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate."). *Ames*, 115 B.R. at 38 (in examining requests by a debtor for interim financing, courts apply the same business judgment standard applicable to other business decisions); *In re Simasko Prod. Co*., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A*., 762 F.2d 1303, 1311 (5th Cir. 1985).

36.    In general, a bankruptcy court should defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *See In re Curlew Valley Assoc.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.*, at 513-14 (footnotes omitted).

37.    The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the Pre-Petition Agreements and the Interim Order. The terms of the DIP Financing are fair and

reasonable and are in the best interests of the Debtors' estates, and the Debtors consent or otherwise

agree to the terms and liens to be granted to the DIP Lender pursuant to the Interim Order. Of

particular note, the costs associated with factoring the Debtors' receivables under the Pre-Petition

Agreements are extraordinarily low, which is uncommon with traditional factor relationships.

Accordingly, the Debtors should be granted authority to obtain funding from the DIP Lender on

the secured, administrative super-priority basis described above, pursuant to 11 U.S.C. § 364(c),

and take the other actions contemplated by the Interim Order as requested herein.

38.     The Debtors believe they could not obtain financing from any other lender on terms

more favorable than the DIP Financing offered by the DIP Lender, and certainly not before the

Debtors' limited cash resources are depleted by the search. The Debtors' management exercised

their best business judgment in negotiating the DIP Financing and the Interim Order that is

presently before the Court.

**D.     Authorizing use of Cash Collateral.**

39.     The Debtors seek authority to use the Cash Collateral and approval to grant

adequate protection to CarrierNet. 11 U.S.C. § 363(c)(2) permits a debtor to use, sell or lease cash

collateral if the entity with an interest in such cash collateral consents or the Court authorizes

such use. 11 U.S.C. § 363(c)(2). The Court should authorize the use of the Cash Collateral in these

cases because the Debtors need the Cash Collateral to meet their ongoing payroll-related

obligations and obligations to other essential providers of goods and services.

> In construing requests to use cash collateral, a bankruptcy court
> should resolve issues in favor of reorganization and maximization
> of the value of assets of the estate: because the ultimate benefit to be
> achieved by a successful reorganization inures to all the creditors of
> the estate, a fair opportunity must be given to the Debtors to achieve
> that end. Thus, while interests of the secured creditor … are of
> concern to the court, the interests of all other creditors also have
> bearing upon the question of whether use of cash collateral shall be

permitted during the early stages of administration.

*Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397-98 (10th Cir. 1987).

40.     In this case, the Debtors' ability to survive depends on being able to use the Cash Collateral to continue their operations. Accordingly, the Debtors seek authority, in accordance with the Pre-Petition Agreements, the Interim Order, and with the Budget: (a) to use the advances under the Pre-Petition Agreements during the period commencing immediately after the entry of the Interim Order and terminating upon the occurrence of an Event of Default (as defined below) or the termination of the DIP Financing in accordance with its terms; (b) to use all Cash Collateral of CarrierNet and to grant CarrierNet adequate protection as set forth in the Interim Order and the Final DIP Order; and (c) to use all Cash Collateral, regardless of whether any other creditor may claim an interest in such Cash Collateral.

### E.     Request for modification of the Automatic Stay.

41.     As set forth more fully in the proposed Interim Order, the proposed DIP Financing contemplates a modification of the automatic stay to permit the DIP Lender to take certain actions required or permitted by the Interim Order, and ultimately by the Final DIP Order. More specifically, the Interim Order provides the DIP Lender with relief from the automatic stay to allow the DIP Lender, among other things, to implement the terms of the Interim Order, and to enforce certain remedies against the Post-Petition Collateral and the account debtors thereof, without having to obtain any further order of the Bankruptcy Court. The Debtors submit that stay modification provisions of this sort are ordinary and usual features of post-petition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim Order and the Final DIP Order.

**F.      The Debtors make these requests in good faith.**

42.      Section 364(e) was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction." *In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of Section 364(e) is "to overcome people's natural reluctance to deal with 'a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."). *See also In re North Atlantic Millwork Corp.*, 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankrupt entities.").

43.      Good faith is not defined by the Bankruptcy Code, and courts define good faith by what it is rather than what it is not. *Latam,* 620 B.R. at 792. "Specifically, courts will not find good faith where there is fraud, collusion, actions for an improper purpose, or knowledge of illegality of the transaction." *Id.*

44.      The DIP Financing is and will be the result of good faith and  arm's-length negotiations, with all parties represented by counsel. There is no improper purpose behind the DIP financing. The Debtors believe that the terms of the DIP Financing are fair and reasonable under the circumstances, and that DIP Lender is entitled to the benefits of Section 364(e) of the Bankruptcy Code.

**G.      Interim approval of the DIP Financing.**

45.      Bankruptcy Rule 4001(c)(2) provides that a final hearing on a motion to obtain credit under 11 U.S.C. § 364 may not be commenced earlier than fifteen days after the service of

such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited

hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid

immediate and irreparable harm to a debtor's estate.

46.     Pursuant to Bankruptcy Rules 400l(c) and (d), the Debtors request that the Court

conduct an expedited interim hearing as soon as practicable to consider entry of the Interim Order

authorizing the Debtors to obtain funding under the terms of the Pre-Petition Agreements and the

Interim Order in an amount sufficient to fund their operating expenses pending a final hearing on

the DIP Financing.

47.     The Debtors also respectfully request that the Court schedule the final hearing on

this Motion no later than fifteen days after the entry of the Interim Order. Such relief is necessary

to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to the

Debtors' estates.

48.     No prior request for the relief sought herein has been made to this or any other

Court.

## V.      NOTICE AND REQUEST FOR FINAL HEARING

49.     Notice of this Motion is being given by e-mail, facsimile, overnight delivery, and/or

courier to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the

United States Trustee; (b) the Office of the United States Attorney for the Southern District of

Ohio; (c) the Office of the United States Attorney General; (d) the United States Treasury, Internal

Revenue Service, (f) counsel for the DIP Lender; (e) any known creditor that may claim an interest

in the Pre-Petition Collateral, the Priority Post-Petition Collateral, or the Junior Collateral; and, (f)

each of the Debtors' twenty (20) largest unsecured creditors. At the time this motion was filed, no

subchapter V trustee had been appointed; but the Debtors will serve the subchapter V trustee when

20

appointed. The Debtors submit that, considering the nature of the relief requested, no other or further notice need be given.

Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request the Court set a date for the Final Hearing on the requested relief.

## VI.    CONCLUSION

For the foregoing reasons, granting the relief requested is appropriate and in the best interest of all parties-in-interest. The Debtors respectfully request that the Court enter the Interim Order substantially in the form attached as <u>Exhibit A</u>.

i.    permitting the Debtors to obtain DIP Financing on the terms and conditions as set forth above; and

ii.    granting such other and further relief as the Court may deem proper.

Respectfully submitted,

 /s/  James A. Coutinho
Thomas R. Allen        (0017513)
Richard K. Stovall      (0029978)
James A. Coutinho      (0082430)
Allen Stovall Neuman & Ashton LLP
17 South High Street, Suite 1220
Columbus, Ohio 43215
T: (614) 221-8500      F: (614) 221-5988
allen@ASNAlaw.com; stovall@ASNAlaw.com;
coutinho@ASNAlaw.com
*Proposed Counsel for Debtors/Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No: 21-52150 |
| 5AAB Transport, LLC, *et al.* | : | Chapter 11 |
| | : | Judge John E. Hoffman, Jr. |
| Debtors. | : | |
| | : | Joint Administration Requested |

### INTERIM ORDER (1) AUTHORIZING POST-PETITION FINANCING AND USE OF CASH COLLATERAL, (2) GRANTING LIENS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (3) MODIFYING THE AUTOMATIC STAY, AND (4) APPROVING NOTICE FOR FINAL HEARING (DOC. )

This matter comes before the Court on the *Motion of 5AAB Transport, LLC, and SJS Transport, LLC, to (1) Authorize Post-Petition Financing and Use of Cash Collateral, (2) Grant Liens and Super-Priority Administrative Expense Status, (3) Modify the Automatic Stay, and (4) Approve Notice for Final Hearing* (the "DIP Motion") (Doc.___)[1] filed by 5AAB Transport, LLC ("Transport"), and SJS Transport, LLC ("SJS", together, the "Debtors"), debtors and debtors in possession. Through the DIP Motion and pursuant 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507, and Rules 2002, 4001,6004 and 9014 of the

---

[1] Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the DIP Motion.

Federal Rules of Bankruptcy Procedure, the Debtors seek entry of an interim order (the "Interim

Order") authorizing the Debtors to:

(i)  Obtain senior secured post-petition financing (the "DIP Financing") pursuant to the terms and conditions of the Pre-Petition Agreements, the Interim Order, and the Final DIP Order;

(ii)  Authorize the continued funding of the Debtors' operations, on an interim and final basis, pursuant to Pre-Petition Agreements between CarrierNet Group Financial, Inc. ("CarrierNet" or the "DIP Lender") and (a) Transport and (b) SJS;

(iii)  Grant to the DIP Lender allowed super-priority administrative expense claims in these chapter 11 cases for the DIP Financing;

(iv)  Grant to the DIP Lender automatically perfected security interests in and liens on all of the collateral described in the Pre-Petition Agreements, including, without limitation, all property constituting "cash collateral" (as defined in 11 U.S.C. § 363(a), "Cash Collateral");

(v)  Obtain authorization to use the proceeds of the DIP Financing in accordance with the Budget, a copy of which is attached hereto as Exhibit 1;

(vi)  Obtain authorization to use Cash Collateral of the DIP Lender in accordance with the Budget;

(vii)  Extend the Budget period with approval of the DIP Lender, without further order of the Court;

(viii)  Provide adequate protection to the DIP Lender pursuant to the terms of the Interim Order for any diminution in value of its interests in the Pre-Petition Collateral of the Debtors, including any Cash Collateral;

(ix)  Modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of this Interim Order and Final DIP Order;

(x)  Schedule a final hearing (the "Final Hearing") to consider entry of the Final DIP Order granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(xi)  Waive any applicable stay as provided in the Bankruptcy Rules and to provide for immediate effectiveness of the Interim Order.

The Court having reviewed the DIP Motion, the Pre-Petition Agreements, the declaration of Hardeep Singh (the "Singh Declaration") (Doc. 8), the pleadings filed with the Court, the evidence and arguments proffered or adduced at the hearing held before this Court on June [__], 2021 (the "Interim Hearing"), and upon the record of these Chapter 11 Cases; and adequate notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Rules; and all objections, if any, to the relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment and is necessary for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED:[2]**

**I.    FINDINGS OF FACT**

a.    On June 21, 2021 (the "Petition Date") the Debtors filed their voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing these Chapter 11 Cases. The Debtors have elected treatment under Subchapter V of Chapter 11 of the Bankruptcy Code.[3]

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

[3] Filed jointly with the chapter 11 cases of the Debtors are the chapter 11 cases of their affiliated companies, Heavy Diesel Service, LLC ("Diesel") and 5AAB Holding, LLC ("Holding"). Diesel has also elected treatment under Subchapter V but Holding has not elected such treatment.

b.      The Debtors continue to manage and operate their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. [_____] has been appointed by the Office of the United States Trustee (the "UST") to serve as the Subchapter V Trustee in the Debtors' Chapter 11 Cases (the "Subchapter V Trustee").

c.      Transport, SJS and the DIP Lender are parties to Billing, Collecting and Settlement Agreements dated September 26, 2011 and October 18, 2013, respectively, pursuant to which the DIP Lender made credit accommodations and advances to the Debtors on a secured basis through the factoring of accounts receivable (the "Pre-Petition Agreements").

d.      As of the Petition Date, Transport and SJS were indebted to the DIP Lender in the amounts of $194,496.42 and $29,395.55, respectively, secured by the collateral described in the Pre-Petition Agreements.

e.      Prior to the Petition Date, the Debtors had assigned and sold certain receivable accounts to DIP Lender under the Pre-Petition Agreements, and DIP Lender has agreed to consider making purchases of eligible accounts from the Debtors pursuant thereto on a post petition basis.

f.      The Debtors, notwithstanding their efforts to do so, are unable to obtain unsecured credit allowable under Section 503(b) or 507(b) of the Bankruptcy Code as an administrative expense, other than pursuant to Section 364(c)(2) and 364(c)(3) and the Debtors are unable to obtain credit on terms equal to or more favorable than those proposed by DIP Lender.

g.      DIP Lender has agreed to consider providing financial accommodations through the purchase of accounts from the Debtors in accordance with the Pre-Petition Agreements in good faith, within the meaning of Section 364(e) of the Bankruptcy Code.

h.      Good cause exists for approval of the Debtors' obtaining financing from the DIP

Lender under the terms of the Pre-Petition Agreements, and the entry of this Interim Order will

minimize disruption of the Debtors as "going concerns" and is in the best interest of the Debtors,

their creditors, and their estates. The terms upon which the Debtors are authorized to utilize cash

advances to be made by the DIP Lender are fair under the circumstances.

i.      The Debtors have provided written notice of the filing of the DIP Motion to the DIP

Lender, the United States Trustee, the Subchapter V Trustee, the twenty largest unsecured creditors

of the Debtors, all of the Debtors' secured creditors, the Internal Revenue Service, and all parties

who filed requests for notice as evidenced by the certificate of service filed by the Debtors' counsel

with this Court, which notice this Court finds to be appropriate and adequate under Federal Rules

of Bankruptcy Procedure 2002 and 4001, and as required by Section 364 of the Bankruptcy Code.

j.      The Debtors admit, without prejudice to the rights of the Subchapter V Trustee and

third parties to challenge same to the extent set forth below, that as of the Petition Date, in

accordance with the Pre-Petition Agreement, the Debtors were indebted to the DIP Lender, without

defense, counterclaim, recoupment or setoff, in respective amounts as stated in paragraph (d)

above, secured by valid, enforceable and, where applicable, properly perfected liens in the

collateral described in the Pre-Petition Agreements.

## II.     ORDER

Based on the foregoing findings, it is now therefore ORDERED as follows:

1.      All capitalized terms used in this Order, not otherwise defined herein and unless

otherwise indicated, shall have the meaning given them in the DIP Motion or the Bankruptcy Code.

2.      Attached hereto as <u>Exhibit 1</u> is a cash budget prepared by the Debtors, reflecting

their anticipated cash income and expenses for the periods reflected therein (the "Budget").

3.      The Debtors are authorized, effective immediately, to sell their accounts receivable, to the DIP Lender on a secured basis subject to the terms of the Pre-Petition Agreements, and to execute all documents and take all actions to be executed and taken in connection with and in furtherance of all undertakings and obligations thereunder.

4.      The Debtors are deemed to have so ratified the Pre-Petition Agreements.

5.      The Debtors are authorized and empowered to incur secured indebtedness to the DIP Lender pursuant to this Interim Order and the Pre-Petition Agreements in such amounts as needed in the ordinary course of their businesses in accordance with the Budget.

6.      Pursuant to Section 364(c)(2) and 364(c)(3) of the Bankruptcy Code, the Debtors may grant to the DIP Lender security interests in the property as set forth in the Pre-Petition Agreements effective as of the date of the Petition Date ("Collateral") as collateral for all present and future obligations of the Debtors to the DIP Lender. The security interests shall be senior to all other liens in the Collateral except those for validly perfected pre-petition liens as of the Petition Date and shall be subject and subordinate to (i) allowed claims of professionals of the Debtors, to the extent such claims are set forth in the Budget, plus an additional $20,000 from and after any Event of Default, (ii) all fees required to be paid to the Clerk of Court and to the Office of the United States Trustee under Section 1930(a) of Title 28 of the United States Code, and (iii) the fees of the Subchapter V Trustee (collectively, the "Carve Out").

7.      All amounts owed by the Debtors under the Pre-Petition Agreements and this Interim Order shall constitute a super-priority administrative expense claim under Section 364(c)(1) of the Bankruptcy Code, which shall be deemed allowed, without further filing by DIP Lender, and which shall have priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject and subordinate only to the Carve-

Out.

8.      The liens granted to DIP Lender herein are deemed validly granted, duly attached, and properly perfected, without the need of any additional actions being taken by or on behalf of DIP Lender, including but not limited to, the filing or recording of Uniform Commercial Code financing statements.

9.      The Debtors may use the proceeds of any advance under the Pre-Petition Agreement only in accordance with the Budget.

10.      The DIP Lender is hereby afforded the protection of Section 364(e) of the Bankruptcy Code with regard to the reversal or modification on appeal of this Order, or to the modification, vacating, or other amendment of this Interim Order by this Court.

11.      The Debtors shall comply with all provisions of Pre-Petition Agreements.

12.      To the extent that any provision of the Pre-Petition Agreements causes either of the Debtors to be in default thereunder solely as a result of it being subject to the Bankruptcy Code or it being insolvent, said provisions are waived by the DIP Lender.

13.      The entry of this Interim Order and execution, delivery, and performance under the Pre-Petition Agreements, or under any other documents executed in connection therewith, do not constitute a compromise, waiver, or other relinquishment of any right of the DIP Lender at law, in equity or otherwise, including, but not limited to, any right of the DIP Lender to request and to obtain relief under the Bankruptcy Code.

14.      The automatic stay provisions of 11 U.S.C. § 362 are modified to enable the DIP Lender to implement the provisions of this Interim Order and otherwise thereby to permit the DIP Lender to demand and receive collections on account of the Collateral, and to apply those collections to the outstanding obligations owed the DIP Lender in accordance with the Pre-Petition

Agreements. Notwithstanding the foregoing, the DIP Lender is not hereby granted relief from the automatic stay to enforce any remedies against the Debtors that may be afforded under the Pre-Petition Agreements. In the event a Default occurs under the terms of the Pre-Petition Agreements, the DIP Lender shall have a right to notice an expedited hearing before this Court seeking such relief as may be deemed appropriate upon three days' notice to counsel for the Debtors; (ii) the Subchapter V Trustee; (iii) the United States Trustee; (iv) the twenty largest unsecured creditors; and (v) the United States Attorney's Office.

15.    The Debtors will not seek to surcharge the DIP Lender or the Collateral with any expenses of the type described in the Bankruptcy Code unless it obtained the DIP Lender's prior written consent to the incurrence of such expenses.

16.    An event of default under this Interim Order ("Default") shall include the following:

a.    the Debtors' failure to perform or comply with any of the terms, conditions, or covenants of this Interim Order;

b.    The Debtors' failure to perform or comply with any of the terms, conditions, or covenants of the Pre-Petition Agreements from and after the entry of this Interim Order;

c.    The termination of this Interim Order by its own terms, operation of law or court order;

d.    The dismissal of the Debtors' bankruptcy cases;

e.    The conversion of the Debtors' bankruptcy cases to cases under another chapter of the Bankruptcy Code.

17.    Upon the occurrence of a Default, the DIP Lender shall provide written notice of such Default to the Debtors and counsel for the Debtors. If the Debtors fail to cure the Default within three (3) business days from the time of service of such notice of the Default, all of the following shall be deemed to have occurred unless otherwise waived by the DIP Lender in

writing:

    a.  the DIP Lender's consent regarding the Debtors' use of the Cash Collateral pursuant to this Order shall be terminated without further notice;

    b.  the Debtors shall not use any Cash Collateral for any purpose;

    c.  the Debtors shall hold and segregate all Cash Collateral in trust for the DIP Lender; and

    d.  the DIP Lender shall be entitled to an expedited hearing on a motion for immediate relief from the automatic stay under Section 362 within not less than ten (10) business days from the date of the Default, subject to the Court's calendar (the "Stay Relief Motion").

18.    The authorization to use the Cash Collateral pursuant hereto shall terminate upon the expiration of the period reflected in the Budget; provided, however, that the DIP Lender and the Debtors may extend such authorization without further notice, motion, or order of this Court by filing with the Court a supplemental budget as a modification to this Interim Order.

19.    Without prejudice to the rights of the Subchapter V Trustee and third parties to challenge the same, the obligations and indebtedness owed under the Pre-Petition Agreements are valid and indefeasible obligations of the Debtors and their estates, in accordance with their terms, and the liens and security interests in favor of the DIP Lender granted hereby with respect to the Collateral are valid, enforceable, perfected, and unavoidable under the Bankruptcy Code, including Section 552, and any other applicable law.

20.    The Debtors' counsel shall serve a copy of this Interim Order on the following parties: the DIP Lender, the DIP Lender's counsel, the United States Trustee, the Subchapter V Trustee, the twenty largest unsecured creditors of the Debtors, all of the Debtors' secured creditors,

the Internal Revenue Service, and any party that has requested notice pursuant to Bankruptcy Rule 2002 within two business days of its entry

21.     The Final Hearing is schedule for [_____], 2021 at [ _____ ], am/pm (prevailing Eastern Time) before this Court [describe hearing type]. Any objections or responses to the entry of a final order granting the relief requested in the DIP Motion shall be in writing and shall be filed with the Court and served on the Debtors' counsel on or before 4:00 p.m., prevailing Eastern Time, on [_____], 2021. Any objections by creditors or any other party in interest to the DIP Motion or any of the provisions of this Interim Order shall be deemed waives unless filed and received in accordance with the foregoing on or before such date and time.

        SO ORDERED.

SUBMITTED BY:

 /s/ James A. Coutinho_____
Thomas R. Allen          (0017513)
Richard K. Stovall       (0029978)
James A. Coutinho        (0082430)
Allen Stovall Neuman & Ashton LLP
17 South High Street, Suite 1220
Columbus, Ohio 43215
T: (614) 221-8500       F: (614) 221-5988
allen@ASNAlaw.com; stovall@ASNAlaw.com;
coutinho@ASNAlaw.com
*Proposed Counsel for Debtors/Debtors in Possession*

Copies to be served pursuant to terms of Order.

**<u>EXHIBIT 1</u>**

[Budget]

# CarrierNet
## GROUP FINANCIAL ®

Toll-Free: 877-747-2807
Fax: 605-335-6039

500 W 10th St
Suite 102
Sioux Falls, SD
57104-3600

*Cash Flow and Grow Your Business*

## BILLING, COLLECTING AND SETTLEMENT AGREEMENT

This Billing, Collecting and Settlement Agreement (the "Agreement") is made as of **September 26, 2011** by and between the Carriernet Group Financial, Inc. ("Carriernet Group Financial") having a place of business at 500 West 10th Street Suite 102, Sioux Falls, SD 57104, **and 5AAB Transport LLC.** ("carrier") having its principal place of business and chief executive office at **1543 Gage Street, Columbus OH 43240**

**Section 1. <u>DEFINITIONS.</u>** When used herein, the following terms shall have the following meanings:

1.1     "<u>Billed Receivables</u>" shall mean carrier selected receivables arising out of the freight bills invoiced on carrier's behalf.

1.2     "<u>Receivable</u>" shall mean accounts, bills of lading contract rights, chattel paper, instruments, documents, general intangibles, letters of credit, drafts, banker's acceptances, and rights to payment, and all proceeds thereof.

1.3     "<u>Repurchased Receivable Obligation</u>" shall refer to a Billed receivable that a carrier has become obligated to Re-purchase under Section 4 hereof.

1.4     "<u>Collections</u>" shall mean all funds deposited and cleared by Carriernet Group Financials depository bank from or on behalf of an Account Debtor with respect to Billed Receivables.

1.5     "<u>Billing and Collecting percentage</u>" shall be at **4.0**% of each freight bill invoiced.

1.6     "<u>Early Pay Advance Percentage</u>" shall be at **90**% of each freight bill invoiced after consideration of billing and collecting percentage.

1.7     "<u>Adjustments</u>" shall mean all discounts, allowances, returns, disputes, counterclaims, offsets, defenses, rights of recouping, rights or return, freight and warranty claims, or short payments, asserted by or on behalf of any Account Debtor with respect to any Billed Receivable.

1.8     "<u>Settlement charges</u>" shall mean charges due carriers, brokers and agents for transacting loads and shipments settled by Carriernet Group Financial.

1.9     "<u>Schedule of Accounts</u>" shall mean freight bills that accurately identify the Billed Receivables which Carriernet Group Financial, bills and shall include the correct amount owed by the Account Debtor, the name and address of the Account Debtor, the freight bill date and the freight bill number.  The account will include all repurchase receivable obligations, settlement charges, debits, adjustments, and fees charged for a reconciliation period.

1.10    "<u>Payment Period</u>" shall be **30** calendar working days from date of mailing or electronically transmission of the Billed Receivable by Carriernet Group Financial.

1.11    "<u>Account Debtor</u>" shall have the meaning set forth in the Uniform Commercial Code and shall include any person liable on any Billed Receivable.

1.12    "<u>Reconciliation Period</u>" shall, unless otherwise notified by Carriernet Group Financial mean a <u>monthly</u> calendar period.

1.13    "<u>Write Off Period</u>" shall mean **70** calendar days after mailing or transmission date of Billed Receivable.

1.14    "<u>Insolvent</u>" shall mean with respect to an Account Debtor that such Account Debtor has filed, or has had filed against it, any bankruptcy case, or has made an assignment for the benefit of creditors.

1.15    "<u>Dispute</u>" shall mean a dispute, claim, or defense of any kind whatsoever, whether valid of invalid, asserted by an Account Debtor that may reduce the amount collectible by Carriernet Group Financial from Account Debtor.

1.16    "<u>E-commerce site</u>" shall mean the Internet facilities residing on a web server which can be reached with an Internet browser by typing www.SHIPPERNET.COM.

1.17    <u>Minimum bill fee</u>: **20.00** per invoice or agreed "Billing and Collecting percentage" (1.5) whichever is greater.

## Section 2. **BILLING OF RECEIVABLES**

2.1     Acceptance of Receivables. Carriernet Group Financial provides a billing, collecting and settlement service for shippers and carriers transacting business with Carriernet Group Financial.  In providing this service Carriernet Group Financial shall have no obligation to bill, collect and settle for any load or shipment for which Carriernet Group Financial has not approved credit prior to the transaction.

2.2     Billing of Receivables. Carriernet Group Financial in its sole discretion will notify each Account Debtor of a Billed Receivable invoiced by Carriernet Group Financial along with copies of invoices and purchase orders, contracts, bills of lading or other proof of delivery or service.  Carriernet Group Financial shall be entitled to rely on all of the information provided to Carriernet Group Financial. Each invoice shall bear a notice, in form satisfactory to Carriernet Group Financial, that it has been assigned to and is payable only to Carriernet Group Financial.

2.3     Effectiveness of Billing and Collecting by Carriernet Group Financial. Effective upon Carriernet Group Financial acceptance of a to-be Billed Receivable, carrier, carrier agent or independent agent will have absolutely sold, transferred and assigned to Carriernet Group Financial, all of rights, title and interest in and to each Billed Receivable and all monies due or which may become due on or with respect to such Billed Receivable.

2.4     Billing and collecting fees.  The carrier agrees to pay a billing and collecting fee based upon the percentage set forth in Section 1.5.  The percentage will be based upon each freight bill invoiced or repurchased under Section 4.

2.5     Establishment of a Reserve Balance. Upon the billing by Carriernet Group Financial of each Billed Receivable, Carriernet Group Financial shall, unless waived by Carriernet Group Financial in its sole discretion, establish a Reserve Balance. The Reserve Balance shall be the amount by which the face amount of the Billed Receivables (Section 1.1) exceeds Repurchase Receivable Obligations (Section 1.3), Collections (Section 1.4), billing and collecting fees (Section 1.5), early pay advance fees (Section 1.6), Adjustments (Section 1.7), and settlement charges (Section 1.8).  The reserve balance shall be the remaining monthly book balance maintained on the records of Carriernet Group Financial at the end of each reconciliation period and shall not be a segregated fund.

2.6     Reserve Reimbursements. Reserves will be reimbursed to the carrier on or around the 1st and the 15th day of each month. Amounts will be determined by excess of the reserve rate. Pending the approval of CNGF.

## Section 3. **COLLECTIONS, CHARGES, AND SETTLEMENTS**

3.1     Collections. All Billed Receivable collections will go directly to Carriernet Group Financial and Carriernet Group Financial shall apply all Collections to Account Debtor s account.

3.2     Collections in possession of Carrier. Carrier will hold in trust and safekeeping, as the sole property of Carriernet Group Financial, and turn over the next banking day any misdirected payments mailed or transmitted to carrier, carrier agent, or independent agent.  The misdirected payments or transmissions must be in identical form received.  In the event carrier comes into possession of a remittance comprising payments of both a Billed Receivable and Receivable which have not been assigned to Carriernet Group Financial, carrier shall hold same in accordance with the provisions set forth above and immediately turn same over to Carriernet Group Financial, in identical form received. Upon collection of such item, Carriernet Group Financial shall remit to carrier its portion thereof less applicable fees. Carrier, carrier agent or independent agent agrees to indemnify and hold Carriernet Group Financial harmless from and against any and all claims, loss, costs and expenses caused by or arising out of the Receivables or any attempt by Carriernet Group Financial to collect same or resolve any Dispute.  Failure to turn such payments over to Carriernet Group Financial within three banking days will result in an additional Early Pay Advance fee of 3% of the amount originally billed by Carriernet Group Financial.

3.3     Early Pay Advance Percentage.  Early Pay Advances will be based upon each Billed Receivable invoiced. The amount shall be calculated by taking the percentage set forth in Section 1.6 multiplied by the Billed Receivable less the Billing and collecting fees. At no time the amounts advanced as early pay may exceed the sum of all undisputed Billed Receivables less disputed Billed Receivables, repurchases, commitments and fees. Carriernet Group Financial shall not make any early pay advances that would cause the Account balances due to become negative.

3.4     Accounting. Carrier, carrier agent or independent agent shall immediately upon billing by Carriernet Group Financial, make proper entries on its books and records classifying the billed receivable as an amount due from Carriernet Group Financial and not any other person. Carrier will immediately furnish Carriernet Group Financial statements (balance sheet and income statement), tax records and other information as reasonably requested by Carriernet Group Financial. Carriernet Group Financial shall prepare and send to carrier after the close of each reconciliation period an accounting of the transactions for that calendar month, including the amount of all Billed Receivables, all Collections, Adjustments, Billing Fees, and Early pay Fees. The accounting shall be deemed correct and conclusive unless carrier makes written objection to Carriernet Group Financial within thirty (30) days after the date Carriernet Group Financial mails the accounting to the carrier.

3.5     Settlement to Carrier. Provided that there does not then exist an Event of Default or Dispute or any event of condition Carriernet Group Financial shall settle with carrier the amount, if any, which Carriernet Group Financial owes to carrier, at the end of the Reconciliation Period according to the accounting prepared by Carriernet Group Financial for that Reconciliation Period.  The Settlement shall be an amount equal to:
3.5.1     The Account Balance as of the beginning of a Reconciliation Period, plus:
3.5.2     The Balance created for each Billed Receivable invoices during that Reconciliation Period, minus:

2

3.5.3    Reserve amounts;

    3.5.3.1    Billing Fees;

    3.5.3.2    Advances and Early Payment Advance Fees;

    3.5.3.3    Automatic Clearing House electronic entries

    3.5.3.4    Adjustments

    3.5.3.5    Repurchase Receivables, to the extent Carriernet Group Financial has agreed to accept payment thereof by deduction; and

In the event the settlement set forth in this Section 3.5 results in an amount due to Carriernet Group Financial the carrier shall immediately make such payment to Carriernet Group Financial or assign sufficient additional receivables sufficient to bring balance to zero.

## Section 4. REPURCHASE RECEIVABLE OBLIGATIONS

4.1    <u>Carrier's Agreement to Repurchase.</u>  Carrier agrees to pay to Carriernet Group Financial on demand, the full face amount, or any unpaid portion of, any Billed Receivable;

    4.1.1    Which remains unpaid for the Payment Period unless prior to the expiration of the Payment Period, the subject Account Debtor has become Insolvent or

    4.1.2    With respect to which there has been any breach of warranty or representation set forth in Section 6 hereof or any breach of any covenant contained in this Agreement; or

    4.1.3    With respect to which the Account Debtor asserts any Dispute.

4.2    <u>Additional fees due on Repurchases.</u>  Carrier agrees to pay to Carriernet Group Financial additional fees for Billed Receivables when:

    4.2.1    A Billed Receivable amount exceeds a 30-day Payment period but is less than **70** calendar days, carrier agrees to pay Carriernet Group Financial an additional daily fee equal to .0000 times the original billed receivable amount.

    4.2.2    A Billed Receivable exceeding **70** calendar days will bear an additional 0% of the Billed Receivable amount.  Repurchase will be made with an ACH (Account Clearing House) transaction charge against the carrier's bank account.

By signing this agreement, carrier hereby authorizes Carriernet Group Financial to charge directly by an ACH transaction any amounts due under Section 4.1 or 4.2.  The carrier will provide the necessary ACH account information set forth in Exhibit A.

## Section 5. POWER OF ATTORNEY. In order to carry out this billing, collecting and settlement agreement to Carriernet Group Financial hereunder, carrier does hereby irrevocably appoint Carriernet Group Financial and its successors and assigns as carrier's true and lawful attorney in fact, with respect to Billed Receivables. Carrier hereby authorizes Carriernet Group Financial, regardless of whether there has been an Event of Default:

(a)    To sell, assign, transfer or pledge the whole or any part of the Billed Receivables;

(b)    To demand, collect, receive, sue, and give releases to any Account Debtor for the monies due or which may become due upon or with respect to the Billed Receivables and to compromise, prosecute, or defend any action, claim, case or proceeding relating to the Billed Receivables, including the filing of a claim or the voting of such claims in any bankruptcy case, all in Carriernet Group Financial name or carrier's name as Carriernet Group Financial may choose;

(c)    To prepare, file and sign carrier's name on any notice, claim, assignment, demand, draft or notice of or satisfaction of lien or mechanic's lien or similar document;

(d)    To receive, open, and dispose of all mail addressed to carrier for the purpose of collecting the Billed Receivables;

(e)    To endorse carrier's name on any checks or other forms of payment on the Billed Receivable;

(f)    To do all acts and things necessary or expedient, in furtherance of any such purposes.

(g)    To authorize electronic entries to my checking/savings account to collect for any repurchases that exceed the **70** day payment period.  This authorization may be revoked at any time by writing to the address contained above in this agreement.  It may not be revoked if carrier's balance as calculated in Section 3.5 would result in a negative settlement balance.

## Section 6: REPRESENTATIONS, WARRANTIES, AND COVENANTS.

6.1    <u>Receivables' Warranties, Representations and Covenants.</u>  To induce Carriernet Group Financial to Bill Receivables and to render its services to carrier, and with full knowledge that the truth and accuracy of the following are being relied upon by the Carriernet Group Financial in determining whether to accept Billed Receivables, carrier represents, warrants, covenants and agrees, with respect to each Billed Receivable invoiced by Carriernet Group Financial and each Receivable described therein that;

6.1.1    The correct face amount of each Billed Receivable is not in Dispute;

6.1.2    The payment of each Receivable is not contingent upon the fulfillment of any obligation or contract, past or future, and any and all the obligations of shipping required of the carrier have been fulfilled as of the date of Carriernet Group Financial billing.

6.1.3    Each Billed Receivable is based on the delivery of goods and / or services actually rendered on terms not to exceed 30 days, does not represent a sale to a parent, subsidiary or affiliate of the carrier, is presently due and owing to carrier, is not past due or in default, has not been previously sold, assigned, transferred, or pledged, is not a consignment sale or bill and hold transaction, and is free of any and all liens, security interests and encumbrances other than liens, security interests or encumbrances in favor of Carriernet Group Financial or any other division of or affiliate of Carriernet Group Financial;

6.1.4    There are no defense, offsets, or counterclaims against any of the Billed Receivables, and no agreement has been made under which the Account Debtor my claim any deduction or discount;

6.1.5    At the times that Carriernet Group Financial makes an Advance relating to a Receivable, the Account Debtors are then not insolvent and carrier has no knowledge that the Account Debtors are insolvent or may become insolvent within the Payment Period;

6.1.6    Carrier shall not take or permit any action to countermand notification to Account Debtors of Carriernet Group Financial ownership of Billed Receivables.

6.2    <u>Additional Warranties, Representations, and Covenants.</u> In addition to the foregoing warranties, representations and covenants, to induce Carriernet Group Financial to render its services to carrier, carrier hereby represents, warrants, covenants and agrees that:

6.2.1    Carrier will not assign, transfer, sell or grant any security interest in any Collateral to any other party, without Carriernet Group Financial prior written consent;

6.2.2    The carrier's name, form of organization, place of business and the place where the records concerning all receivables herein referred to are kept is set forth at the beginning of this Agreement, and carrier will give Carriernet Group Financial 30 days advance notice in writing if such name, organization, place of business or record keeping is to be changed or a new place of business or record keeping is to be added and shall execute any documents necessary to perfect Carriernet Group Financial interest in Billed Receivables and the Collateral;

6.2.3    Carrier shall pay all of its normal gross payroll for employees, and all federal and state taxes, as and when due, including without limitation all payroll and withholding taxes and state sales taxes;

6.2.4    Carrier has not, as of the time of a Billed Receivable filed a voluntary petition for relief under the United States Bankruptcy code or had filed against it an involuntary petition for relief;

6.2.5    Carrier, if a corporation, is duly incorporated and, at all times, in good standing under the laws of the State of South Dakota and is duly qualified in all States where such qualification is required. has all required licenses to operate its business and transacts business under no trade names or trade style.

**Section 7. <u>NOTICE OF ADJUSTMENTS.</u>** In the event of a breach of any of the representations, warranties, or covenants set forth in Section 6, or in the event any Dispute is asserted by any Account Debtor, carrier shall promptly advise Carriernet Group Financial. Carrier shall, subject to the Carriernet Group Financial approval, resolve such disputes and advise Carriernet Group Financial of an Adjustment. Until the disputed Billed Receivable is repurchased by carrier and the full amount of the Billed Receivable is paid, Carriernet Group Financial shall remain the absolute owner of any Billed Receivable which is subject to Adjustment or repurchase under Section 4.1.

**Section 8. <u>SECURITY INTEREST.</u>** In order to secure carrier's now existing or hereafter arising obligations and indebtedness to Carriernet Group Financial, howsoever arising, whether under this Agreement or otherwise (collectively the "Obligations"), carrier hereby grants to Carriernet Group Financial a lien upon and security interest in all of carrier's property, equipment, inventory, including health-care receivables, chattel paper, instruments, letter of credit, documents, deposit accounts, investment property, money accounts, accounts, including the Billed accounts invoiced by Carriernet Group Financial, other rights to payment or performance, general intangibles, all fixtures, attachments, accessions, accessories, tools, parts, repairs, and all additions, replacements of and substitutions for all or any part of the foregoing property, as well as all insurance refunds, goodwill, products and proceeds related to the foregoing ("Collateral"). Carrier is not authorized to sell, assign, transfer or otherwise convey any such Billed Receivable as Collateral without Carriernet Group Financial prior written consent. Carrier agrees to sign and to allow Carriernet Group Financial to file UCC financing statements, in a form acceptable to Carriernet Group Financial. Carrier agrees to deliver to Carriernet Group Financial the originals of all instruments, chattel paper and documents evidencing or related to a Billed Receivable or other security provided hereunder.

**Section 9. <u>DEFAULT.</u>** The occurrence of any one of more of the following shall constitute an Event of Default hereunder:

(a)    Carrier fails to pay or perform any Obligation as arid when due;

(b)    There shall be commenced by or against carrier any voluntary or involuntary case under the United States Bankruptcy Code, or any assignment for the benefit of creditors, or appointment of a receiver or custodian for any of its assets, or carrier makes or sends notice of a bulk transfer;

(c)    Carrier or any guarantor of the Obligations shall become insolvent in that its debts are greater than the fair value of its assets, or carrier is generally not paying its debts as they become due or is left with unreasonably small capital;

(d)    Any lien, garnishment, attachment, execution or the like is issued against or attaches to the carrier, the Billed Receivables, or the Collateral;

(e)    Carrier shall breach any covenant, agreement, warranty, or representation set forth herein;

(f)    Carrier delivers any document, financial statement, schedule or report to Carriernet Group Financial which is false or incorrect in any material respect; or

(g)    Any present or future guarantor of the Obligations revokes, terminates or fails to perform any of the terms of any guaranty, endorsement or other agreement of such party in favor of Carriernet Group Financial or any affiliate of Carriernet Group Financial.

**Section 10. <u>REMEDIES UPON DEFAULT.</u>** Upon the occurrence of an Event of Default, the Obligations shall bear interest at a rate per annum equal to the per annum rate of the Early Payment Advance Fee and Billing Fee. Carriernet Group Financial may, without implying any obligation cease billing receivables or extending any early payment advances to carrier, and

(a)    Declare all Obligations immediately due and payable;

(b)    Withhold any further advances to carrier until all Obligations have been paid in full;

(c)    Notify all Account Debtors to pay Carriernet Group Financial directly, whether such Receivable is a Billed Receivable or not;

(d)    Direct the U.S. Post Office or other party to forward mail to an address specified by Carriernet Group Financial;

(e)    Exercise all rights under the power of attorney set forth in Section 5 above with respect to all Collateral and all remedies set forth herein;

(f)    Settle, compromise, adjust or litigate Receivables on such terms as Carriernet Group Financial deems necessary to protect its rights in said Receivables;

(g)    Proceed against carrier or any guarantor directly without any obligation to proceed against the Collateral;

(h)    Exercise any right or remedy with respect to carrier or the Collateral granted under applicable law or this Agreement.

The carrier will pay to Carriernet Group Financial immediately upon demand all reasonable fees and expenses of attorneys and other professionals that Carriernet Group Financial incurs in enforcing this Agreement or any other agreement executed in connection herewith.

**Section 11. SEVERABLILTY, WAIVER OR RIGHTS.** This Agreement constitutes the entire Agreement between the parties and may no be modified or amended or any right or remedy of Carriernet Group Financial waived, except by agreement or the parties in writing. In the event that any provision or this Agreement is deemed invalid by reason of law, this Agreement will be construed as not containing such provision and the successors and assigns, but may not be assigned by carrier without Carriernet Group Financial written consent. Any delay or failure by Carriernet Group Financial to exercise any deemed a waiver of the right or remedy on any subsequent occasion.

**Section 12. CHOICE OF LAW, JURISDICTION, WAIVER OF JURY TRIAL.** This Agreement has been transmitted by carrier to Carriernet Group Financial at Carriernet Group Financial office in the State of South Dakota and has been executed and accepted by Carriernet Group Financial in the State of South Dakota. This Agreement shall be governed by and interpreted in accordance with the laws of the State of South Dakota. Carrier hereby irrevocably submits to the jurisdiction of any South Dakota State or Federal court sitting in Minnehaha County in any action or proceeding arising out of or relating to this Agreement, or other agreements. Carrier hereby irrevocably agrees that all claims with respect to such action or proceeding. Carrier consents to the service of any and all process in any such action or proceeding by the mailing copies of such process to carrier's address specified in the Agreement. CARRIER HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY SUIT OR PROCEEDING ARISING UNDER OR RELATING TO THIS AGREEMENT.

**Section 13. EFFECTIVENESS: TERM.** This Agreement shall only become effective upon execution and delivery by carrier and acceptance by Carriernet Group Financial and, unless earlier terminated as provided in this Agreement, shall continue in full force and effect for an initial term of **12 months** from the date hereof. The agreement shall be deemed automatically renewed for successive **12 month** periods. Unless earlier terminated as provided in the Agreement, all Obligations shall be due and payable in full at the expiration of the last renewal term. This Agreement may be terminated prior to the end of the initial term or any renewal term as follows:

(a) Carrier may terminate this Agreement at any time after giving Carriernet Group Financial at least thirty (30) days prior written notice. Any such termination shall be effective upon payment to Carriernet Group Financial in full of all Obligations.

(b) This Agreement shall automatically terminate following the occurrence of an Even of Default under Section 9. Upon any such termination following an Event of Default, all Obligations shall be due and payable in full.

Notwithstanding the foregoing, any termination of this Agreement shall not affect Carriernet Group Financial security interest in the Collateral and Carriernet Group Financial ownership of the Billed Receivables. This Agreement shall continue to be effective, and Carriernet Group Financial rights and remedies hereunder shall survive such termination, until all transactions entered into and Obligations incurred hereunder or in connection herewith have been completed and satisfied in full.

**Section 14. PARTICIPATIONS; ASSIGNMENTS.** Carrier understands that Carriernet Group Financial may from time to time transfer and assign its rights under this Agreement to one or more assignees. Carrier hereby consents to these transfers and assignments by Carriernet Group Financial to one or more assignees. Carrier hereby consents that any and all defenses, claims or counterclaims that it may have against the Carriernet Group Financial shall be limited to, and may only be brought against, Carriernet Group Financial and may not extend to any assignee, including but not limited to the funding obligations.

Carrier and Carriernet Group Financial intend that any and all direct or indirect assignees of the Carriernet Group Financial of the type set forth above shall be the third party beneficiaries of this Agreement.

IN WITNESS, carrier has executed and delivered this Agreement for acceptance by Carriernet Group Financial as of the day and year about written. Carrier must have their signature acknowledged by a properly authorized employee of carrier.

Carrier:

5AAB Transport  LLC.

By: _____

Print Name: _Hardeep  Singh_

Title: _President_

Date: _9|27|11_

Company:

Carriernet Group Financial Inc.

By: _____

Title: _VP_

Date: _9-29-11_

Witnessed by: _____

Date Witnessed: _9-29-2011_

REBECCA A. BARZ
NOTARY PUBLIC
SEAL  SOUTH DAKOTA  SEAL

12- 2015

 **CarrierNet**

Toll-free: 877-747-2807
Fax: 605-335-6039
Email: sales@carriernet.com

526 W 10th St.
Sioux Falls, SD
57104-3600

*Cash Flow and Grow Your Business*

## ADDENDUM TO BILLING SETTLING COLLECTING AGREEMENT.

CarrierNet Group Financial Inc. agrees to amend the following definition on the Billing, Settling and Collection agreement signed by **5AAB TRANSPORT LLC** "Carrier" on March 31, 2021.

Section 1. **DEFINITIONS.** When used herein, the following terms shall have the following meanings:

1.5 "Billing and Collecting percentage" shall be at **2**% of each freight bill invoiced.
1.13 "Write Off Period" shall mean **90** calendar days after mailing or transmission date of Billed Receivable.

MC # 757362
DOT # 2181131

CarrierNet

Sign: _Ryan Wilbeck_

Ryan Wilbeck

SALES MANAGER

5AAB TRANSPORT LLC

Sign: _____

Print Name: _Hardeep Singh_

Title: _President_

EXHIBIT C
Page 1 of 6

**CarrierNet**
GROUP FINANCIAL ®

Toll-Free: 877-467-2807
Fax: 605-335-6039
Email: customerservice@carriernetgroup.com

Suite 102
Sioux Falls, SD

*Cash Flow and Grow Your Business*

### BILLING, COLLECTING AND SETTLEMENT AGREEMENT

This Billing, Collecting and Settlement Agreement (the "Agreement") is made as of **October 18, 2013** by and between the Carriernet Group Financial, Inc. ("Carriernet Group Financial") having a place of business at 500 West 10th Street Suite 102, Sioux Falls, SD 57104 **and SJS Transport LLC.** ("carrier") having its principal place of business and chief executive office at **822 Oakley Drive, Delaware OH 43015**.

**Section 1. DEFINITIONS.** When used herein, the following terms shall have the following meanings:

1.1    "Billed Receivables" shall mean carrier selected receivables arising out of the freight bills invoiced on carrier's behalf.

1.2    "Receivable" shall mean accounts, bills of lading contract rights, chattel paper, instruments, documents, general intangibles, letters of credit, drafts, bankers acceptances, and rights to payment, and all proceeds thereof.

1.3    "Repurchased Receivable Obligation" shall refer to a Billed receivable that a carrier has become obligated to Re-purchase under Section 4 hereof.

1.4    "Collections" shall mean all funds deposited and cleared by Carriernet Group Financial's depository bank from or on behalf of an Account Debtor with respect to Billed Receivables.

1.5    "Billing and Collecting percentage" shall be at **3.0%** of each freight bill invoiced.

1.6    "Early Pay Advance Percentage" shall be at **90%** of each freight bill invoiced after consideration of billing and collecting percentage.

1.7    "Adjustments" shall mean all discounts, allowances, returns, disputes, counterclaims, offsets, defenses, rights of recouping, rights or return, freight and warranty claims, or short payments, asserted by or on behalf of any Account Debtor with respect to any Billed Receivable.

1.8    "Settlement charges" shall mean charges due carriers, brokers and agents for transacting loads and shipments settled by Carriernet Group Financial.

1.9    "Schedule of Accounts" shall mean freight bills that accurately identify the Billed Receivables which Carriernet Group Financial, bills and shall include the correct amount owed by the Account Debtor, the name and address of the Account Debtor, the freight bill date and the freight bill number.  The account will include all repurchase receivable obligations, settlement charges, debits, adjustments,  and fees charged for a reconciliation period.

1.10   "Payment Period" shall be **30** calendar working days from date of mailing or electronically transmission of the Billed Receivable by Carriernet Group Financial.

1.11    "Account Debtor" shall have the meaning set forth in the Uniform Commercial Code and shall include any person liable on any Billed Receivable.

1.12   "Reconciliation Period" shall, unless otherwise notified by Carriernet Group Financial mean a monthly calendar period.

1.13   "Write Off Period" shall mean **70** calendar days after mailing or transmission date of Billed Receivable.

1.14   "Insolvent" shall mean with respect to an Account Debtor that such Account Debtor has filed, or has had filed against it, any bankruptcy case, or has made an assignment for the benefit of creditors.

1.15   "Dispute" shall mean a dispute, claim, or defense of any kind whatsoever, whether valid of invalid, asserted by an Account Debtor, that may reduce the amount collectible by Carriernet Group Financial from Account Debtor.

1.16   "E-commerce site" shall mean the Internet facilities residing on a web server which can be reached with an Internet browser by typing www.SHIPPERNET.COM.

1.17   Minimum bill fee: **20.00** per invoice or agreed "Billing and Collecting percentage" (See 1.5) whichever is greater.

Initial _____

## Section 2.  BILLING OF RECEIVABLES

2.1  Acceptance of Receivables. Carriernet Group Financial provides a billing, collecting and settlement service for shippers and carriers transacting business with Carriernet Group Financial.  In providing this service Carriernet Group Financial shall have no obligation to bill, collect and settle for any load or shipment for which Carriernet Group Financial has not approved credit prior to the transaction.

2.2  Billing of Receivables. Carriernet Group Financial in its sole discretion will notify each Account Debtor of a Billed Receivable invoiced by Carriernet Group Financial along with copies of invoices and purchase orders, contracts, bills of lading or other proof of delivery or service.  Carriernet Group Financial shall be entitled to rely on all of the information provided to Carriernet Group Financial. Each invoice shall bear a notice, in form satisfactory to Carriernet Group Financial, that it has been assigned to and is payable only to Carriernet Group Financial.

2.3  Effectiveness of Billing and Collecting by Carriernet Group Financial. Effective upon Carriernet Group Financial acceptance of a to-be Billed Receivable, carrier, carrier agent or independent agent will have absolutely sold, transferred and assigned to Carriernet Group Financial, all of rights, title and interest in and to each Billed Receivable and all monies due or which may become due on or with respect to such Billed Receivable.

2.4  Billing and collecting fees. The carrier agrees to pay a billing and collecting fee based upon the percentage set forth in Section 1.5. The percentage will be based upon each freight bill invoiced or repurchased under Section 4.

2.5  Establishment of a Reserve Balance. Upon the billing by Carriernet Group Financial of each Billed Receivable, Carriernet Group Financial shall, unless waived by Carriernet Group Financial in its sole discretion, establish a Reserve Balance. The Reserve Balance shall be the amount by which the face amount of the Billed Receivables (Section 1.1) **exceeds** Repurchase Receivable Obligations (Section 1.3), Collections (Section 1.4), billing and collecting fees (Section 1.5), early pay advance fees (Section 1.6), Adjustments (Section 1.7), and settlement charges (Section 1.8).  The reserve balance shall be the remaining monthly book balance maintained on the records of Carriernet Group Financial at the end of each reconciliation period and shall not be a segregated fund.

2.6  Reserve Reimbursements. Reserves will be reimbursed to the carrier on the 1st and the 15th day of each month. Amounts will be determined by excess of the reserve rate. Pending the approval of CNGF.

## Section 3. COLLECTIONS, CHARGES, AND SETTLEMENTS

3.1  Collections. All Billed Receivable collections will go directly to Carriernet Group Financial and Carriernet Group Financial shall apply all Collections to Account Debtor s account.

3.2  Collections in possession of Carrier. Carrier will hold in trust and safekeeping, as the sole property of Carriernet Group Financial, and turn over the next banking day any misdirected payments mailed or transmitted to carrier, carrier agent, or independent agent. The misdirected payments or transmissions must be in identical form received. In the event carrier comes into possession of a remittance comprising payments of both a Billed Receivable and Receivable which have not been assigned to Carriernet Group Financial, carrier shall hold same in accordance with the provisions set forth above and immediately turn same over to Carriernet Group Financial, in identical form received. Upon collection of such item, Carriernet Group Financial shall remit to carrier its portion thereof less applicable fees. Carrier, carrier agent or independent agent agrees to indemnify and hold Carriernet Group Financial harmless from and against any and all claims, loss, costs and expenses caused by or arising out of the Receivables or any attempt by Carriernet Group Financial to collect same or resolve any Dispute.  Failure to turn such payments over to Carriernet Group Financial within three banking days will result in an additional Early Pay Advance fee of 3% of the amount originally billed by Carriernet Group Financial.

3.3  Early Pay Advance Percentage. Early Pay Advances will be based upon each Billed Receivable invoiced. The amount shall be calculated by taking the percentage set forth in Section 1.6 multiplied by the Billed Receivable less the Billing and collecting fees. At no time the amounts advanced as early pay may exceed the sum of all undisputed Billed Receivables less disputed Billed Receivables, repurchases, commitments and fees.  Carriernet Group Financial shall not make any early pay advances that would cause the Account balances due to become negative.

3.4  Accounting. Carrier, carrier agent or independent agent shall immediately upon billing by Carriernet Group Financial, make proper entries on its books and records classifying the billed receivable as an amount due from Carriernet Group Financial and not any other person. Carrier will immediately furnish Carriernet Group Financial statements (balance sheet and income statement), tax records and other information as reasonably requested by Carriernet Group Financial. Carriernet Group Financial shall prepare and send to carrier after the close of each reconciliation period an accounting of the transactions for that calendar month, including the amount of all Billed Receivables, all Collections, Adjustments, Billing Fees, and Early pay Fees. The accounting shall be deemed correct

2

Initial  HS

EXHIBIT C
Page 3 of 6

and conclusive unless carrier makes written objection to Carriernet Group Financial within thirty (30) days after the date Carriernet Group Financial mails the accounting to the carrier.

3.5     Settlement to Carrier. Provided that there does not then exist an Event of Default or Dispute or any event of condition Carriernet Group Financial shall settle with carrier the amount, if any, which Carriernet Group Financial owes to carrier at the end of the Reconciliation Period according to the accounting prepared by Carriernet Group Financial for that Reconciliation Period. The Settlement shall be an amount equal to:
3.5.1     The Account Balance as of the beginning of a Reconciliation Period, plus:
3.5.2     The Balance created for each Billed Receivable invoices during that Reconciliation Period, minus:
3.5.3     Reserve amounts;
3.5.3.1     Billing Fees;
3.5.3.2     Advances and Early Payment Advance Fees;
3.5.3.3     Automatic Clearing House electronic entries
3.5.3.4     Adjustments
3.5.3.5     Repurchase Receivables, to the extent Carriernet Group Financial has agreed to accept payment thereof by deduction; and

In the event the settlement set forth in this Section 3.5 results in an amount due to Carriernet Group Financial the carrier shall immediately make such payment to Carriernet Group Financial or assign sufficient additional receivables sufficient to bring balance to zero.

## Section 4. REPURCHASE RECEIVABLE OBLIGATIONS

4.1     Carrier's Agreement to Repurchase.  Carrier agrees to pay to Carriernet Group Financial on demand, the full face amount, or any unpaid portion of, any Billed Receivable;
4.1.1     Which remains unpaid for the Payment Period unless prior to the expiration of the Payment Period, the subject Account Debtor has become Insolvent or
4.1.2     With respect to which there has been any breach of warranty or representation set forth in Section 6 hereof or any breach of any covenant contained in this Agreement; or
4.1.3     With respect to which the Account Debtor asserts any Dispute.

4.2     Additional fees due on Repurchases.  Carrier agrees to pay to Carriernet Group Financial additional fees for Billed Receivables when:
4.2.1     A Billed Receivable amount exceeds a 30-day Payment period but is less than **70** calendar days, carrier agrees to pay Carriernet Group Financial an additional daily fee equal to .0000 times the original billed receivable amount.
4.2.2     A Billed Receivable exceeding 70 calendar days will bear an additional 0% of the Billed Receivable amount.  Repurchase will be made with an ACH (Account Clearing House) transaction charge against the carrier's bank account.

By signing this agreement, carrier hereby authorizes Carriernet Group Financial to charge directly by an ACH transaction any amounts due under Section 4.1 or 4.2.   The carrier will provide the necessary ACH account information set forth in Exhibit A.

**Section 5. POWER OF ATTORNEY.** In order to carry out this billing, collecting and settlement agreement to Carriernet Group Financial hereunder, carrier does hereby irrevocably appoint Carriernet Group Financial and its successors and assigns as carrier's true and lawful attorney in fact, with respect to Billed Receivables. Carrier hereby authorizes Carriernet Group Financial, regardless of whether there has been an Event of Default:
(a)   To sell, assign, transfer or pledge the whole or any part of the Billed Receivables;
(b)   To demand, collect, receive, sue, and give releases to any Account Debtor for the monies due or which may become due upon or with respect to the Billed Receivables and to compromise, prosecute, or defend any action, claim, case or proceeding relating to the Billed Receivables, including the filing of a claim or the voting of such claims in any bankruptcy case, all in Carriernet Group Financial name or carrier's name as Carriernet Group Financial may choose;
(c)   To prepare, file and sign carrier's name on any notice, claim, assignment, demand, draft or notice of or satisfaction of lien or mechanic's lien or similar document;
(d)   To receive, open, and dispose of all mail addressed to carrier for the purpose of collecting the Billed Receivables;
(e)   To endorse carrier's name on any checks or other forms of payment on the Billed Receivable;
(f)   To do all acts and things necessary or expedient, in furtherance of any such purposes.
(g)   To authorize electronic entries to my checking/savings account to collect for any repurchases that exceed the 60 day payment period.  This authorization may be revoked at any time by writing to the address contained above in this agreement.  It may not be revoked if carrier's balance as calculated in Section 3.5 would result in a negative settlement balance.

## Section 6: REPRESENTATIONS, WARRANTIES, AND COVENANTS.

3

Initial _____

6.1    <u>Receivables' Warranties. Representations and Covenants.</u> To induce Carriernet Group Financial to Bill Receivables and to render its services to carrier, and with full knowledge that the truth and accuracy of the following are being relied upon by the Carriernet Group Financial in determining whether to accept Billed Receivables, carrier represents, warrants, covenants and agrees, with respect to each Billed Receivable invoiced by Carriernet Group Financial and each Receivable described therein that;

6.1.1    The correct face amount of each Billed Receivable is not in Dispute;

6.1.2    The payment of each Receivable is not contingent upon the fulfillment of any obligation or contract, past or future, and any and all the obligations of shipping required of the carrier have been fulfilled as of the date of Carriernet Group Financial billing.

6.1.3    Each Billed Receivable is based on the delivery of goods and / or services actually rendered on terms not to exceed 30 days, does not represent a sale to a parent, subsidiary or affiliate of the carrier, is presently due and owing to carrier, is not past due or in default, has not been previously sold, assigned, transferred, or pledged, is not a consignment sale or bill and hold transaction, and is free of any and all liens, security interests and encumbrances other than liens, security interests or encumbrances in favor of Carriernet Group Financial or any other division of or affiliate of Carriernet Group Financial;

6.1.4    There are no defense, offsets, or counterclaims against any of the Billed Receivables, and no agreement has been made under which the Account Debtor my claim any deduction or discount;

6.1.5    At the times that Carriernet Group Financial makes an Advance relating to a Receivable, the Account Debtors are then not insolvent and carrier has no knowledge that the Account Debtors are insolvent or may become insolvent within the Payment Period;

6.1.6    Carrier shall not take or permit any action to countermand notification to Account Debtors of Carriernet Group Financial ownership of Billed Receivables.

6.2    <u>Additional Warranties. Representations, and Covenants.</u> In addition to the foregoing warranties, representations and covenants, to induce Carriernet Group Financial to render its services to carrier, carrier hereby represents, warrants, covenants and agrees that:

6.2.1    Carrier will not assign, transfer, sell or grant any security interest in any Collateral to any other party, without Carriernet Group Financial prior written consent;

6.2.2    The carrier's name, form of organization, place of business and the place where the records concerning all receivables herein referred to are kept is set forth at the beginning of this Agreement, and carrier will give Carriernet Group Financial 30 days advance notice in writing if such name, organization, place of business or record keeping is to be changed or a new place of business or record keeping is to be added and shall execute any documents necessary to perfect Carriernet Group Financial interest in Billed Receivables and the Collateral;

6.2.3    Carrier shall pay all of its normal gross payroll for employees, and all federal and state taxes, as and when due, including without limitation all payroll and withholding taxes and state sales taxes;

6.2.4    Carrier has not, as of the time of a Billed Receivable filed a voluntary petition for relief under the United States Bankruptcy code or had filed against it an involuntary petition for relief;

6.2.5    Carrier, if a corporation, is duly incorporated and, at all times, in good standing under the laws of the State of South Dakota and is duly qualified in all States where such qualification is required. has all required licenses to operate its business and transacts business under no trade names or trade style.

6.3    <u>Offered Programs.</u> Carrier expressly acknowledges that any incentive, discount or group program which Carriernet Group Financial may offer to, or advertise for participation by, carrier, inc'uding, but not limited to a fuel card program, is at Carriernet Group Financial's sole discretion and in all cases is as-is, with no representations, guarantees or assurances of continuation, availability or honor. Carrier shall have no rights, recourse or claim against Carriernet Group Financial for any discontinuance, change in terms, processing errors or other problems, including arising as a result of negligence of any person, including agents of Carriernet Group Financial and carrier hereby expressly waives any such rights. Carriernet Group Financial shall not be liable to carrier for any damages of any kind in connection with such programs, and carrier hereby agrees that in all cases, its participation in any such program is subject to the terms of this paragraph. Carrier will indemnify and hold Carriernet Group Financial harmless for any damages, costs or other injury incurred by Carriernet Group Financial in the event carrier has a dispute with respect to such programs.

**Section 7. <u>NOTICE OF ADJUSTMENTS.</u>** In the event of a breach of any of the representations, warranties, or covenants set forth in Section 6, or in the event any Dispute is asserted by any Account Debtor, carrier shall promptly advise Carriernet Group Financial. Carrier shall, subject to the Carriernet Group Financial approval, resolve such disputes and advise Carriernet Group Financial of an Adjustment. Until the disputed Billed Receivable is repurchased by carrier and the full amount of the Billed Receivable is paid, Carriernet Group Financial shall remain the absolute owner of any Billed Receivable which is subject to Adjustment or repurchase under Section 4.1.

**Section 8. <u>SECURITY INTEREST.</u>** In order to secure carrier's now existing or hereafter arising obligations and indebtedness to Carriernet Group Financial, howsoever arising, whether under this Agreement or otherwise (collectively the "Obligations"), carrier hereby grants to Carriernet Group Financial a lien upon and security interest in all of carrier's property, equipment, inventory, including health-care receivables, chattel paper, instruments, letter of credit, documents, deposit accounts,

Initial _____ HS

**EXHIBIT C**
**Page 5 of 6**

investment property, money accounts, accounts, including the Billed accounts invoiced by Carriernet Group Financial, other rights to payment or performance, general intangibles, all fixtures, attachments, accessions, accessories, tools, parts, repairs, and all additions, replacements of and substitutions for all or any part of the foregoing property, as well as all insurance refunds, goodwill, products and proceeds related to the foregoing ("Collateral"). Carrier is not authorized to sell, assign, transfer or otherwise convey any such Billed Receivable as Collateral without Carriernet Group Financial prior written consent. Carrier agrees to sign and to allow Carriernet Group Financial to file UCC financing statements, in a form acceptable to Carriernet Group Financial. Carrier agrees to deliver to Carriernet Group Financial the originals of all instruments, chattel paper and documents evidencing or related to a Billed Receivable or other security provided hereunder.

**Section 9. DEFAULT.** The occurrence of any one of more of the following shall constitute an Event of Default hereunder:
(a)  Carrier fails to pay or perform any Obligation as arid when due;
(b)  There shall be commenced by or against carrier any voluntary or involuntary case under the United States Bankruptcy Code, or any assignment for the benefit of creditors, or appointment of a receiver or custodian for any of its assets, or carrier makes or sends notice of a bulk transfer;
(c)  Carrier or any guarantor of the Obligations shall become insolvent in that its debts are greater than the fair value of its assets, or carrier is generally not paying its debts as they become due or is left with unreasonably small capital;
(d)  Any lien, garnishment, attachment, execution or the like is issued against or attaches to the carrier, the Billed Receivables, or the Collateral;
(e)  Carrier shall breach any covenant, agreement, warranty, or representation set forth herein;
(f)  Carrier delivers any document, financial statement, schedule or report to Carriernet Group Financial which is false or incorrect in any material respect; or
(g)  Any present or future guarantor of the Obligations revokes, terminates or fails to perform any of the terms of any guaranty, endorsement or other agreement of such party in favor of Carriernet Group Financial or any affiliate of Carriernet Group Financial.

**Section 10. REMEDIES UPON DEFAULT.** Upon the occurrence of an Event of Default, the Obligations shall bear interest at a rate per annum equal to the per annum rate of the Early Payment Advance Fee and Billing Fee. Carriernet Group Financial may, without implying any obligation cease billing receivables or extending any early payment advances to carrier, and

(a)  Declare all Obligations immediately due and payable;
(b)  Withhold any further advances to carrier until all Obligations have been paid in full;
(c)  Notify all Account Debtors to pay Carriernet Group Financial directly, whether such Receivable is a Billed Receivable or not;
(d)  Direct the U.S. Post Office or other party to forward mail to an address specified by Carriernet Group Financial;
(e)  Exercise all rights under the power of attorney set forth in Section 5 above with respect to all Collateral and all remedies set forth herein;
(f)  Settle, compromise, adjust or litigate Receivables on such terms as Carriernet Group Financial deems necessary to protect its rights in said Receivables;
(g)  Proceed against carrier or any guarantor directly without any obligation to proceed against the Collateral;
(h)  Exercise any right or remedy with respect to carrier or the Collateral granted under applicable law or this Agreement.

The carrier will pay to Carriernet Group Financial immediately upon demand all reasonable fees and expenses of attorneys and other professionals that Carriernet Group Financial incurs in enforcing this Agreement or any other agreement executed in connection herewith.

**Section11. SEVERABLILTY, WAIVER OR RIGHTS.** This Agreement constitutes the entire Agreement between the parties and may not be modified or amended or any right or remedy of Carriernet Group Financial waived, except by agreement or the parties in writing. In the event that any provision or this Agreement is deemed invalid by reason of law, this Agreement will be construed as not containing such provision and the successors and assigns, but may not be assigned by carrier without Carriernet Group Financial written consent. Any delay or failure by Carriernet Group Financial to exercise any deemed a waiver of the right or remedy on any subsequent occasion.

**Section 12. CHOICE OF LAW, JURISDICTION, WAIVER OF JURY TRIAL.** This Agreement has been transmitted by carrier to Carriernet Group Financial at Carriernet Group Financial office in the State of South Dakota and has been executed and accepted by Carriernet Group Financial in the State of South Dakota. This Agreement shall be governed by and interpreted in accordance with the laws of the State of South Dakota. Carrier hereby irrevocably submits to the jurisdiction of any South Dakota State or Federal court sitting in Minnehaha County in any action or proceeding arising out of or relating to this Agreement, or other agreements. Carrier hereby irrevocably agrees that all claims with respect to such action or proceeding. Carrier consents to the service of any and all process in any such action or proceeding by the mailing copies of such process to carrier's address specified in the Agreement. CARRIER HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY SUIT OR PROCEEDING ARISING UNDER OR RELATING TO THIS AGREEMENT.

**Section 13. EFFECTIVENESS: TERM.** This Agreement shall only become effective upon execution and delivery by carrier and acceptance by Carriernet Group Financial and, unless earlier terminated as provided in this Agreement, shall continue in

Initial 

EXHIBIT C
Page 6 of 6

full force and effect for an initial term of 12 months from the date hereof. The agreement shall be deemed automatically renewed for successive 12 month periods. Unless earlier terminated as provided in the Agreement, all Obligations shall be due and payable in full at the expiration of the last renewal term. This Agreement may be terminated prior to the end of the initial term or any renewal term as follows:

(a)    Carrier may terminate this Agreement at any time after giving Carriernet Group Financial at least thirty (30) days prior written notice. Any such termination shall be effective upon payment to Carriernet Group Financial in full of all Obligations.

(b)    This Agreement shall automatically terminate following the occurrence of an Even of Default under Section 9. Upon any such termination following an Event of Default, all Obligations shall be due and payable in full.

Notwithstanding the foregoing, any termination of this Agreement shall not affect Carriernet Group Financial security interest in the Collateral and Carriernet Group Financial ownership of the Billed Receivables. This Agreement shall continue to be effective, and Carriernet Group Financial rights and remedies hereunder shall survive such termination, until all transactions entered into and Obligations incurred hereunder or in connection herewith have been completed and satisfied in full.

**Section 14. PARTICIPATIONS; ASSIGNMENTS.**  Carrier understands that Carriernet Group Financial may from time to time transfer and assign its rights under this Agreement to one or more assignees. Carrier hereby consents to these transfers and assignments by Carriernet Group Financial to one or more assignees. Carrier hereby consents that any and all defenses, claims or counterclaims that it may have against the Carriernet Group Financial shall be limited to, and may only be brought against, Carriernet Group Financial and may not extend to any assignee, including but not limited to the funding obligations.

Carrier and Carriernet Group Financial intend that any and all direct or indirect assignees of the Carriernet Group Financial of the type set forth above shall be the third party beneficiaries of this Agreement.

IN WITNESS, carrier has executed and delivered this Agreement for acceptance by Carriernet Group Financial as of the day and year about written. Carrier must have their signature acknowledged by a properly authorized employee of carrier.

Carrier:

SJS Transport LLC.

By: _____

Print Name:  Hardeep Singh

Title:  Owner

Date:  10/21/13

Witnessed by: _____

Date Witnessed:  10/21/13

Company

Carriernet Group Financial Inc.

By: _____

Title:  VP

Date:  10-25-13

6

Initial____

# EXHIBIT D
# Budget

## Assumptions and Notes

The following notes describe significant assumptions associated with the Budget.

1.      **Average Income and Expenses** – In conjunction with the preparation of the budget, the Debtors reviewed their average performance over the 60-day period prior to the petition date as well as other historical financials. The Debtors have assumed that most income and expenses will continue at an average rate over the budget period as set forth in the Budget. However, the Debtors note that the freight forwarding industry is notoriously volatile with frequent changes in pricing and demand based on a wide variety of industry inputs and seasonal changes. The Debtors believe that the amounts set forth in the Budget will be correct on average, but anticipate that the income and expenses will be spread unevenly over the budget period.

2.      **Adequate Protection Payments** – The Debtors have assumed for the purposes of the Budget that the Court will eventually approve adequate protection payments to the Debtors' main lenders. The Debtors have anticipated that those payments will be made on an interest-only basis. These amounts are estimates only. Nothing in this proposed Budget is an admission or offer from the Debtors as to the appropriateness of such amount and the Debtors reserve all rights in relation thereto.

3.      **Administrative Expenses** – The Debtors, in consultation with their counsel, have made assumptions about the fees and expenses to be incurred during this bankruptcy case, including payment of attorney fees and fees of the subchapter V trustee. These amounts are estimates only and do not bind the Debtors or any administrative claimant.

4.      **Intercompany Payments** – The Debtors have included line items for Repairs and Maintenance and rent for the Commerce Square Building. Those payments are generally for intercompany obligations for services provided by Diesel and Holding, respectively, although certain repairs and maintenance are completed by outside vendors.

5.      **Critical Vendor and Utility Payments** – The Debtors have assumed that they will be given the authority to make critical vendor and utility payments in the ordinary course of business. Those amounts have not been line-itemed in the Budget; rather they are incorporated into the Debtors' standard expenditures in the ordinary course of when those payments are due.

**5AAB Transport, LLC & SJS Transport, LLC**
**Initial 13-Week Budget**

| | Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|---|
| | Week Start Date | 6/21/2021 | 6/28/2021 | 7/5/2021 | 7/12/2021 | 7/19/2021 | 7/26/2021 | 8/2/2021 | 8/9/2021 |
| | Week End Date | 6/27/2021 | 7/4/2021 | 7/11/2021 | 7/18/2021 | 7/25/2021 | 8/1/2021 | 8/8/2021 | 8/15/2021 |
| **Summary** | | | | | | | | | |
| **Beginning Cash Balance** | | 12,875.00 | 22,252.00 | 23,156.25 | 29,395.50 | 40,782.50 | 33,894.00 | 36,214.75 | 36,454.00 |
| Income | | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| Operating Expenses | | -65,623.00 | -72,679.25 | -68,760.75 | -63,613.00 | -65,623.00 | -72,679.25 | -68,760.75 | -63,613.00 |
| Chapter 11 Expenses | | 0.00 | -1,416.50 | 0.00 | 0.00 | -16,265.50 | 0.00 | -6,000.00 | 0.00 |
| **Net Change in Cash** | | 9,377.00 | 904.25 | 6,239.25 | 11,387.00 | -6,888.50 | 2,320.75 | 239.25 | 11,387.00 |
| **Ending Cash Balance** | | **22,252.00** | **23,156.25** | **29,395.50** | **40,782.50** | **33,894.00** | **36,214.75** | **36,454.00** | **47,841.00** |
| | | | | | | | | | |
| **Income Detail** | | | | | | | | | |
| Freight Transportation Services | | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| **Total Income** | | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| | | | | | | | | | |
| **Operating Expense Detail** | | | | | | | | | |
| **Payroll Expenses** | | | | | | | | | |
| Owner Salary | | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| W2 Employee | | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Independent Contractors & Carriers | | 34,338.00 | 34,338.00 | 34,338.00 | 34,338.00 | 34,338.00 | 34,338.00 | 34,338.00 | 34,338.00 |
| Payroll Taxes & Expenses | | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| **Total Payroll Expenses** | | 41,838.00 | 41,838.00 | 41,838.00 | 41,838.00 | 41,838.00 | 41,838.00 | 41,838.00 | 41,838.00 |
| | | | | | | | | | |
| **Other Expenses** | | | | | | | | | |
| Utility - Columbia Gas | | 820.00 | 0.00 | 0.00 | 0.00 | 820.00 | 0.00 | 0.00 | 0.00 |
| Utility - Rumpke | | 0.00 | 150.00 | 0.00 | 0.00 | 0.00 | 150.00 | 0.00 | 0.00 |
| Communication - Sprint | | 850.00 | 0.00 | 0.00 | 0.00 | 850.00 | 0.00 | 0.00 | 0.00 |
| Communication - Vonage | | 340.00 | 0.00 | 0.00 | 0.00 | 340.00 | 0.00 | 0.00 | 0.00 |
| Dues and Subscriptions | | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 |
| Insurance | | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 |
| Factoring Charges | | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 |
| Fuel | | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 |
| Tolls | | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| Repairs and Maintenance | | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Travel | | 375.00 | 375.00 | 375.00 | 375.00 | 375.00 | 375.00 | 375.00 | 375.00 |
| Meals | | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| OH Warehouse Rent | | 0.00 | 4,916.25 | 0.00 | 0.00 | 0.00 | 4,916.25 | 0.00 | 0.00 |
| CA Warehouse Rent | | 0.00 | 0.00 | 5,147.75 | 0.00 | 0.00 | 0.00 | 5,147.75 | 0.00 |
| CA Housing Rent | | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 |
| Rent to 5AAB Holding | | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 |
| **Total Other Expenses** | | 23,785.00 | 30,841.25 | 26,922.75 | 21,775.00 | 23,785.00 | 30,841.25 | 26,922.75 | 21,775.00 |
| | | | | | | | | | |
| **Total Operating Expense** | | 65,623.00 | 72,679.25 | 68,760.75 | 63,613.00 | 65,623.00 | 72,679.25 | 68,760.75 | 63,613.00 |
| | | | | | | | | | |
| **Chapter 11 Expense Detail** | | | | | | | | | |
| Adequate Protection - FFB | | 0.00 | 0.00 | 0.00 | 0.00 | 5,048.00 | 0.00 | 0.00 | 0.00 |
| Adequate Protection - SBA | | 0.00 | 0.00 | 0.00 | 0.00 | 717.50 | 0.00 | 0.00 | 0.00 |
| Adequate Assurance Deposit | | 0.00 | 1,416.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Attorney Fees | | 0.00 | 0.00 | 0.00 | 0.00 | 8,500.00 | 0.00 | 6,000.00 | 0.00 |
| Accountant | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Subchapter V Trustee Fees | | 0.00 | 0.00 | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 |
| **Total Chapter 11 Expenses** | | 0.00 | 1,416.50 | 0.00 | 0.00 | 16,265.50 | 0.00 | 6,000.00 | 0.00 |

EXHIBIT D
Page 2 of 2

**5AAB Transport, LLC & SJS Transport, LLC**
**Initial 13-Week Budget**

| | Week # 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|
| Week Start Date | 8/16/2021 | 8/23/2021 | 8/30/2021 | 9/6/2021 | 9/13/2021 |
| Week End Date | 8/22/2021 | 8/29/2021 | 9/5/2021 | 9/12/2021 | 9/19/2021 |
| **Summary** | | | | | |
| **Beginning Cash Balance** | 47,841.00 | 49,452.50 | 60,839.50 | 58,160.25 | 64,399.50 |
| Income | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| Operating Expenses | -65,623.00 | -63,613.00 | -72,679.25 | -68,760.75 | -65,623.00 |
| Chapter 11 Expenses | -7,765.50 | 0.00 | -5,000.00 | 0.00 | 0.00 |
| **Net Change in Cash** | 1,611.50 | 11,387.00 | -2,679.25 | 6,239.25 | 9,377.00 |
| **Ending Cash Balance** | 49,452.50 | 60,839.50 | 58,160.25 | 64,399.50 | 73,776.50 |
| | | | | | |
| | | | | | |
| **Income Detail** | | | | | |
| Freight Transportation Services | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| **Total Income** | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| | | | | | |
| **Operating Expense Detail** | | | | | |
| **Payroll Expenses** | | | | | |
| Owner Salary | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| W2 Employee | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Independent Contractors & Carriers | 34,338.00 | 34,338.00 | 34,338.00 | 34,338.00 | 34,338.00 |
| Payroll Taxes & Expenses | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| **Total Payroll Expenses** | 41,838.00 | 41,838.00 | 41,838.00 | 41,838.00 | 41,838.00 |
| | | | | | |
| **Other Expenses** | | | | | |
| Utility - Columbia Gas | 820.00 | 0.00 | 0.00 | 0.00 | 820.00 |
| Utility - Rumpke | 0.00 | 0.00 | 150.00 | 0.00 | 0.00 |
| Communication - Sprint | 850.00 | 0.00 | 0.00 | 0.00 | 850.00 |
| Communication - Vonage | 340.00 | 0.00 | 0.00 | 0.00 | 340.00 |
| Dues and Subscriptions | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 |
| Insurance | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 |
| Factoring Charges | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 |
| Fuel | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 |
| Tolls | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| Repairs and Maintenance | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Travel | 375.00 | 375.00 | 375.00 | 375.00 | 375.00 |
| Meals | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| OH Warehouse Rent | 0.00 | 0.00 | 4,916.25 | 0.00 | 0.00 |
| CA Warehouse Rent | 0.00 | 0.00 | 0.00 | 5,147.75 | 0.00 |
| CA Housing Rent | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 |
| Rent to 5AAB Holding | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 |
| **Total Other Expenses** | 23,785.00 | 21,775.00 | 30,841.25 | 26,922.75 | 23,785.00 |
| | | | | | |
| **Total Operating Expense** | 65,623.00 | 63,613.00 | 72,679.25 | 68,760.75 | 65,623.00 |
| | | | | | |
| **Chapter 11 Expense Detail** | | | | | |
| Adequate Protection - FFB | 5,048.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Adequate Protection - SBA | 717.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| Adequate Assurance Deposit | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Attorney Fees | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 |
| Accountant | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Subchapter V Trustee Fees | 2,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Chapter 11 Expenses** | 7,765.50 | 0.00 | 5,000.00 | 0.00 | 0.00 |

## CASH COLLATERAL / POSTPETITION FINANCING CHECKLIST

The Debtors, through a separately filed motion, agreed order or stipulation, have requested the approval of cash collateral or post-petition financing or both.  Attached to the motion as Exhibit A is a true and correct copy of the proposed form of Interim Order for use of cash collateral and post-petition financing, which contains the following provisions:

|  | Page No. | Line No. If applicable | Description of Provision |
|---|---|---|---|
| n/a |  |  | (1) Cross-collateralization clauses (i.e., clauses that secure the repayment of prepetition debt with postpetition assets in which the secured lender would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law.) |
| n/a |  |  | (2) Roll-up clauses (i.e., clauses that provide for the use of property of the estate or the proceeds of a postpetition loan to make cash payments on prepetition debt). |
| n/a |  |  | (3) Provisions or findings of fact that release, waive, or limit any claim or other cause of action belonging to the estate or the trustee, including but not limited to (4), (5), (6), and (7) below: |
| n/a |  |  | (4) the release, waiver, or limitation of claims or other causes of action against any secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the interim order and the creditors' committee, if appointed, at least sixty (60) days from the date of its appointment to investigate such matters; |
| n/a |  |  | (5) the release, waiver or limitation of claims or other causes of action against any secured creditor for alleged prepetition torts or breaches of contract; |
| n/a |  |  | (6) the waiver of avoidance actions under the Code; or |
| n/a |  |  | (7) any modification of the statute of limitations or other deadline to commence an action. |
| x | Interim Order, pg. 5, at ¶10. |  | (8) Provisions or findings of fact that determine the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim. |
| x | Interim Order, pg. 6, at ¶6. |  | (9) Provisions that grant a lien on property of the estate that is not otherwise subject to a lien, grant a junior lien on property of the estate that is subject to a lien, or create a lien senior or equal to any existing lien without the consent of that lienholder. |
| x | Interim Order, pg. 8 at ¶15. |  | (10) Provisions that release, waive or limit any right under § 506(c) of the Code. |

| | | | |
|---|---|---|---|
| | | | |
| n/a | | | (11) A budget that does not provide for the payment of all accrued and unpaid administrative expense claims. |
| x | Interim Order, pg. 9, at ¶19. | | (12) Provisions that release, waive or limit any right under §552(b) of the Code. |
| n/a | | | (13) Provisions that grant a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 727(a) of the Code. |
| n/a | | | (14) Provisions that provide disparate treatment with regard to professional fee carveouts for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor. |
| x | Interim Order, pg. 6, at ¶7. . | | (15) Provisions that prime administrative expenses of the kind described in § 503(b) or 507(a) of the Code. |
| n/a | | | (16) Provisions that waive or modify any entity's authority or right to file a plan or seek an extension of time in which the debtor has the exclusive right to file a plan or otherwise operate to divest the debtor of any discretion in the administration of the estate or limit access to the court to seek any relief under other applicable provisions of law. |
| n/a | | | (17) Provisions that establish deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order. |
| n/a | | | (18) Provisions providing for the indemnification of any entity. |
| x | Interim Order, pgs. 7, 8, at ¶14, ¶17_ | — | (19) Provisions waiving or modifying provisions of the Code or applicable Rules relating to the automatic stay. |
| n/a | Interim Order, pg. 6, at ¶8 | | (20) Provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien. |
| n/a | | | (21) Provisions that waive or modify the debtor's right to move for a court order pursuant to § 363(c)(2)(B) of the Code authorizing the use of cash collateral or § 364 of the Code to obtain credit. |
| n/a | | | (22) Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. |
| n/a | | | (23) Findings of fact on matters extraneous to the approval process. |
| n/a | | | (24) Provisions that bar the debtor from future bankruptcy filings. |